MaddeN, Judge,
delivered the opinion of the court:
This is a suit by ship pilots employed by the Panama Canal, an agency of the United States. They sue for overtime compensation at time and one-half their basic rates of pay for work in excess of 40 hours per week. The period covered by *461 the suit is July 1, 1945 to July 1, 1951. The plaintiffs base their claim on section 203 of the Federal Employees Pay Act of 1945, 59 Stat. 297. At the present stage of the case, only the question of liability will be decided.
Section 203 said:
Employees whose basic rate of compensation is fixed on an annual or monthly basis and adjusted from time to time in accordance with prevailing rates by wage boards or similar administrative authority serving the same purpose shall be entitled to overtime pay in accordance with the provisions of Section 23 of the Act of March 28,1934 (U. S. C. 1940 edition, Title 5, Sec. 673c).
The Act of March 28, 1934, referred to in section 203, provided for time and one-half for work in excess of 40 hours per week.
The plaintiffs say that section 203 applied to them. The Government says it did not. The pilots’ compensation was on an annual basis. The only additional question, then, is whether, before and during the period in question, their compensation “was adjusted from time to time in accordance with prevailing rates by wage boards or similar administrative authority serving the same purpose”, within the meaning of section 203.
The pay of the pilots was set by the Governor of the Panama Canal, to whom the President had delegated that authority which had been granted to the President by statute. We held in Poggas v. United States, 118 C. Cls. 385, that the Secretary of the Interior, in setting the wages of employees of the Alaska Railroad, was acting as a “wage fixing authority” within the meaning of the 1934 Act, and we think the same is true of the Governor of the Panama Canal in this case.
Did the Governor adjust the pilots’ pay from time to time in accordance with prevailing rates ? Our findings show in minute detail the processes by which the Governor, on numerous occasions, arrived at his conclusions as to their pay. In 1919 he acted on the recommendation of the Wage Board which then and since then has advised him on questions relating to the pay of most of the mechanical employees of the Canal. In 1927 he corresponded with the Comptroller Gen *462 eral of the United States as to his power to set certain wages for pilots. In 1928 he took the advice of a “Salary Board” appointed by him. In 1939 the Special Assistant to the Governor made a study for him. In 1941 the Chief of the Research and Service Burean of the Canal prepared a memorandum for the Personnel Director on the question. Also in 1941 the Governor appointed a Special Committee of high officials of the Canal to make recommendations to him. In 1945 he appointed a committe to review the provisions of the Federal Employees Pay Act of 1945 and its effect on pay rates of Canal employees. That committee made recommendations as to the pay of the pilots, among others, and the Governor followed some of its recommendations. In 1946 and 1948 he granted increases to the pilots corresponding to the percentage increases granted by Congress to classified employees. In 1948 he appointed a Special Board to consider pilot pay rates, and took the action which the Board recommended. On May 27, 1951, the Governor adopted a pay schedule for the pilots based on the salaries paid masters of ocean-going vessels as fixed in wage agreements between the shipping companies and the union of masters, mates and pilots.
It is apparent from the foregoing that the Governor made his decision as to the pilots’ pay after receiving information and advice. This is, we suppose, what is done by the responsible head of any agency which employs persons whose pay is not fixed by statute. We suppose that, even if he has a regular “Wage Board” he is not bound to follow exactly its recommendations.
The Government says that the Governor, acting as a wage-fixing authority, did not fix the pilots’ wages “in accordance with prevailing rates”, which is the language of section 203. The “prevailing rates” would have seemed to be those which pilots received in United States ports. The Governor was early advised that pilots in United States ports had formed closed associations and had obtained monopolies from the States concerned. The associations, the Governor was advised, overcharged the shipping companies for the services of their members, and divided the income of the associations among the members, giving them incomes excessively high *463 for the value of the work. Such incomes to the Panama Canal pilots would have put their pay above that of the officials of the Canal, and completely out of line with the general pay scale of the Canal. When the pilots urged that their pay should be that of masters of ocean-going vessels, it was urged in opposition that such masters had much greater administrative responsibilities for crew and cargo and were required to be absent from home for long periods.
The abnormal monopolistic situation of the pilots in American ports, as reported to the Governor, made it difficult for him to apply directly the usual measure of prevailing rates. His advisors did, however, consider all the data that were presented to them about the pay for reasonably comparable services in the maritime field, and gave weight to that evidence in making their recommendations. They also considered the duties and responsibilities of the position, the training and education required, and the character of the services performed. They sought to preserve a reasonable correlation between the pay of the pilots and that of other employees of the Canal such as masters of dredges and other floating equipment.
It seems to us that, in the circumstances, the Governor did fix the pilots’ pay “in accordance with prevailing rates” within the meaning of section 203. The income of pilots in the United States not being, in his opinion, a practically usable measure, his advisers looked to other lines of comparable maritime work, and the wages paid for it. Since that work was not identical, but only comparable, the rates of pay for it could not be directly used to fix the pay of the pilots. If the Government carries on an enterprise which has no exact counterpart in private industry, a wage-fixing authority must necessarily use comparisons and analogies in fixing wages in the unique Government enterprise, if it has the duty of setting a fair and competitive wage. We therefore conclude that section 203 was applicable to the plaintiffs.
The Government urges that the pilots belonged to a profession, rather than to a trade or occupation, and were, therefore, not within the scope of section 203. That section does not mention either trades and occupations, or professions, but the Government argues that, since section 23 of the 1934 *464 Act, referred to in section 203, did speak of “the several trades and occupations” in connection with the setting of pay rates by wage boards, the same limitation is implied in section 203. We see no reason for the implication, but if we were to adopt the implication, it would not affect our conclusion. A skill such as that of these pilots, which one learns almost entirely by working at it, and not by academic study, is not what is commonly understood as a profession.
The Government urges laches and res adjudicóla as reasons for rejecting the plaintiffs’ claims. We have considered the Government’s contentions in these regards, and do not find merit in them.
In further proceedings the plaintiffs will prove how much time they worked in excess of 40 hours per week. But in the instant stage of the case we have two special problems as to whether certain time spent by them was working time and therefore compensable.
The pilots are required to be available at designated hours f@r piloting vessels. The usual procedure is that a telephone call to the pilot before 8 a. m. advises him that he will be picked up by a Canal vehicle at a designated time, which time may be several hours later. In the meantime he may do as he pleases, where he pleases, so long as he is available to be picked up at the designated hour. The plaintiffs say that the time between the notification and the pickup time is com-pensable time. We think not. Whatever one’s working hours may be, he cannot do what he pleases in the hours before he goes to work, unless what he pleases to do can be completed in time for him to get to work on time. It may be inconvenient and disrupting to have irregular hours of work, as the pilots have, but section 203 makes no provision for that.
After a pilot has taken a ship through the Canal, he travels back across the Isthmus to his starting point. He is credited with an arbitrary amount of time, 2y3 hours, for this return trip, unless either, (1) the trip is made on the pilot’s day off or (2) the pilot has already worked 40 or more hours in the week in which the return trip is made. No matter when the return trip is made, it is made in the employer’s train or vehicle, without cost to the pilot. The plaintiffs do not question the adequacy of the 2y3 hour allow- *465 anee. They claim, however, that they should receive compensation for all their return trips, including the ones for which they are not now compensated.
It may be that if one has the job, for example, of delivering automobiles by driving them to the purchasers’ places of business in distant cities, he could, without violating laws such as the Fair Labor Standards Act, agree with his employer that his time should stop when he made the delivery, and he would get back to his starting point on his own time and expense. But if the parties agreed that his return time should be working time and compensable, unless it constituted overtime, in which case it should not be working time nor compensable, we think that they would have drawn a distinction which had no logical basis, and could serve only to evade the standards of the law. So we think that here the Panama Canal has by its practice of paying for it, defined the time of the return trip as working time. Since that time is used for the same purpose in the cases in which the employer does not pay for it as in the cases in which it does pay for it, we conclude that the plaintiffs are entitled to be paid for the return trip, even though the return occurs on their day off, or after they have worked 40 hours.
The defendant is liable to the plaintiffs, and the plaintiffs are entitled to a judgment to that effect. The amount of recovery, if any, will be determined in further proceedings pursuant to Buie 38 (c).
It is so ordered.
Laramore, Judge; Whitaker, Judge; Littleton, Judge; and JoNes, Chief Judge, concur.
BINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner Boald A. Hogenson, and the briefs and arguments of counsel, makes the following findings of fact:
1. During the period from July 1, 1945, to July 1, 1951, The Panama Canal was an independent unincorporated agency in the Executive branch of the Government. During all or part of that period, each of the plaintiffs was em *466 ployed by and performed duties for The Panama Canal as a qualified ship pilot.
2. On September 12, 1951, the court entered an order limiting the trial of this case to the issues of law and fact relating to the right of plaintiffs to recover.
3. At all times during the period involved, each plaintiff held the position of pilot by authority of the Governor of The Panama Canal pursuant to the authority vested in the President of the United States by section 81 of title 2 of the Canal Zone Code, as amended by section 3 of the act of July 9,1937, and delegated to the Governor by section 1 of Executive Order 1888 of February 2,1914.
Section 1 (b) of Executive Order 9746 of July 1, 1946, delegated the President’s authority to appoint employees of The Panama Canal to the Secretary of War, and Section 2 of Executive Order 10101 of January 31,1950, amended that section of the Executive Order by substituting “Secretary of the Army” for the words “Secretary of War.” Section 6 of Executive Order 9746 provided that all provisions of prior Executive Orders in effect on the date of its issuance and which were not inconsistent with that order should remain in effect until superseded by action pursuant to the provisions of that order. Neither the Secretary of War nor the Secretary of the Army has chosen to exercise the authority conferred upon them by Section 1 (b) and the former delegation of authority to the Governor under Executive Order 1888 has continued, and appointments of employees of The Panama Canal have continued to be made by authority of the Governor.
4. Each plaintiff obtained his position by meeting the requirements set forth by The Panama Canal and was appointed pilot by authority of the Governor of The Panama Canal after his application for employment had been approved.
5. A Panama Canal pilot is in complete control of the navigation and movement of every foreign and United States vessel entering the Canal waters. Primarily he directs and controls the navigation and movement of ships through the approximately 47 miles of Canal from either Cristobal on the Atlantic side to Balboa on the Pacific, or in the opposite *467 direction. The pilot is responsible for moving the vessel through the three sets of locks in the Canal, the channels, cuts and lakes until the vessel either clears the breakwater on the far side of the Canal or is docked by the pilot. While in complete control of the vessel and responsible for its navigational and engineering safety, the pilot exercises operational supervision over the master and the crew of the vessel and the lock operators, masters of assisting towboats, and other canal employees necessary for the transit. Each pilot also takes his turn every few months for a period of three days on the Pacific side or a week on the Atlantic side as harbor pilot responsible for handling vessels coming in or leaving the docks.
6. To qualify as a Panama Canal pilot, a person must be a high school graduate or possess an equivalent education; have served at least seven years on seagoing craft, one year of which must have been as master; have complete knowledge of navigation, piloting, seamanship, and the fundamentals of ship’s gear and machinery; possess special skill in ship handling; and hold a Federal license for master of a vessel of unlimited tonnage operated on the high seas or Great Lakes.
7. At all times during the period involved, each plaintiff’s basic rate of compensation was fixed by the Governor of the Panama Canal on an annual basis, with semi-monthly payments, and his regular workweek was established at 40 hours.
8. During the period involved in this case, hours worked by Panama Canal pilots were computed in accordance with regulations of The Panama Canal dated July 30, 1945, and December 10,1946.
The regulations dated July 30, 1945, provided in paragraphs 2 and 3, as follows:
2. Pilots Assigned to 8-Hour Daily. Tour of Duty. Harbor pilots, pilots assigned to duty in the Port Captain offices and others working an established 8-hour daily shift will be timed and compensated in conformity with the hours actually worked. Working time should, if practicable, be kept within the established administrative 48-hour workweek.
3. Transit Pilots. Transit pilots should be timed and paid in conformity with the following:
*468 (a) Transit Time. Each pilot should be credited with transit time from the time of leaving the dock to board the ship to which he is assigned until he returns to the dock after completing the transit of the Canal. The Pilot’s time for individual transits will be recorded to the nearest half-hour.
(b) Tra/oel Time: In addition to the transit time, a travel allowance of 2y2 hours is established for each complete transit. In cases of partial transits in either direction, the actual travel time will be calculated to the nearest half hour and allowed as travel time for such a partial transit.
(c) Stand-by Time. Compensation for stand-by time is authorized only for such periods as a pilot may be directed to report and stand by the Port Captain’s Office or some designated place, other than his home.
The regulations dated December 10, 1946, which superseded those of July 30, 1945, provided in paragraphs 1 and 2, as follows:

Timimg and Compensation of Pilots

1. The Governor has approved the following rules relative to the timing and compensation of pilots while on transit duty, effective December 8, 1946. * * *:
(a) Each pilot shall be assigned one day per week as his non-work day.
(b) A pilot’s basic workweek shall consist of the first 40 hours of service performed, exclusive of any service performed on his non-work day. In computing the first 40 hours of service performed there shall be included:
(1) The time spent in transit of the Canal from the time of leaving the dock to board the vessel until the time of reaching the dock after completing the transit ; recorded to the nearest one-third hour.
(2) An allowance for time spent in travel of 2% hours for each complete transit, and, for each partial transit, an allowance of the actual travel time recorded to the nearest one-third hour. This allowance shall be considered as extending from the time of reaching the dock after completing the transit.
(3) The time spent in standing by for such periods, only, as the pilot, pursuant to direction, reports to and stands by at the Port Captain’s office or other designated place excluding the pilot’s home.
(4) Absences on leave with pay, as provided in paragraph (d) below.
*469 (c) For any workweek during which, a pilot remains in a pay status but has been credited with less than 40 hours of service, exclusive of any service performed on his non-work day, he shall be credited automatically with sufficient time to complete his basic workweek of 40 hours.
(d) For the purpose of leave (and also of holiday gratuity as provided below) there shall be maintained a supplementary basic workweek consisting of 6 days of 6% hours each. Authorized absences forming a part of the pilot’s first 40 hours of service, exclusive of his non-work day, shall be charged to leave, but authorized absences after completion of 40 hours of service shall not be charged to leave.
(Example: If a pilot after performing 36 hours of service is authorized to be absent for one day, only 4 hours shall be chargeable and payable as leave.)
(e) For an absence on a gratuity holiday forming a part of the pilot’s first 40 hours of service exclusive of his non-work day, he shall be credited with 6% hours or such portion thereof as when added to the hours of service previously credited shall not exceed 40 hours.
(f) In connection with service performed during his first 40 hours of service, exclusive of his non-work day, a pilot shall be entitled to night pay differential in the same manner as provided for other employees during their regularly scheduled tour of duty, and to double pay for not to exceed 8 hours on a holiday in the same manner as provided for other employees during their basic workweek of 40 hours.
(g) Any service performed by a pilot on his non-work day shall constitute and be paid for as overtime, provided he is in a pay status during his entire, basic workweek of 40 hours.
(h) After a pilot has completed the 40 hours of service constituting his basic workweek (by service, including any leave and holiday gratuity), any service thereafter shall constitute and be paid for as overtime.
(i) In computing the hours of service performed on a pilot’s non-work day and in computing the hours of service performed after completion of the 40-hour basic workweek, there shall not be included any allowance for time spent in travel, and the pilot shall not be entitled to night pay differential, holiday pay or holiday gratuity.
(j) If a pilot is shifted from transit duty to 8-hour harbor duty, or vice versa, the period of transit duty only shall be governed by the above conditions.
*470 2. Pilots assigned to harbor duty or other duty on an 8-hour day; shift shall be timed and compensated in conformity with the hours actually worked.
Under normal circumstances, a pilot made a transit of the Canal every other day until three transits had been accomplished in one week. There were occasions when the volume of traffic required a pilot to make transits on successive days, but those were approximately balanced by occasions when more than one day intervened between transits. Each transit required 9 to 14 hours, varying with traffic conditions in the Canal. A transit was timed from the departure of the pilot from the dock to board the vessel to be transited, to his arrival at the dock on the other side of the Isthmus. In the unusual circumstance that a pilot made only one or two transits within a week, although available for more, and worked less than 40 hours, he was given credit for 40 hours for pay purposes.
The term “travel time”, as used in the foregoing regulations, means the time allowed for the pilot to return across the Isthmus to his home after each transit of the Canal. While plaintiffs were credited with travel time as a part of their regular 40-hour workweek, The Panama Canal did not credit plaintiffs for travel time spent after the 40th hour worked in one week nor for travel time on non-workdays.
9. At all periods of time involved in this action, except as stated in the last sentence of this finding, Panama Canal pilots were paid overtime compensation for work in excess of 40 hours per week, night pay differential, and holiday premium pay, as specified in the provisions of Sections 201, 301 and 302 of the Federal Employees’ Pay Act of 1945, as amended, as construed and applied by regulations issued by the Governor of The Panama Canal. Copies of these regulations are in evidence as plaintiffs’ exhibits Nos. 4, 5, 6, and 7, and are hereby made a part of this finding.
The Canal pilots have not been paid overtime compensation as specified in the provisions of Section 203 of that act.
No overtime compensation for work in excess of 40 hours per week was paid to plaintiffs between May 27, 1951, and July 1,1951.
*471 In January 1953 the Panama Canal Company began paying its pilots time and one-half their basic pay rate for overtime work after 40 honrs in a workweek.
10. The position of Panama Canal Pilot has never been a classified position under the Classification Act of 1923, 5 U. S. C. 661 et seq., or any amendments thereto. The position of Panama Canal Pilot is not a classified position under the Classification Act of 1949, Public Law No. 429, 5 U. S. C. 1071 et seq.
The salaries paid to plaintiffs did not correspond to any statutory schedule of rates set forth in the Classification Act of 1923, or any amendment thereto, or the Classification Act of 1949, or any amendment thereto, or any other statutory schedule of rates.
11. By letter dated March 11, 1919, the Governor of The Panama Canal appointed his Engineer of Maintenance and a representative of the Panama Metal Trades Council as a board to advise him on wages of employees “on the gold roll [which excluded native employees] who are members of the American Federation of Labor.” The functions of this board were advisory to the Governor, and it was directed to follow, in general, rates paid for similar positions in Government service in the continental United States, plus 25 percent; and in the absence of similar Government positions, their recommendations could be based upon the rate paid for a non-Government position, “provided, however, such rates properly co-ordinate with similar or related ones in the Canal service which have been established directly on Government ones.”
The Governor, in outlining the procedure to be followed by employees, said:
Employees, who are members of the American Federation of Labor, will as heretofore take up matters of wages with their supervisory officers, including heads of divisions. If dissatisfied with the ruling received, they may then submit their claims through the American Federation of Labor to the Wage Board. If the Governor, after having received the report of the Wage Board, disapproves the request in whole or in part, it shall not be resubmitted by the individual to the Governor or the Board, but may again, in not less than six *472 months, be resubmitted to the Board through the American Federation of Labor local organization.
Thereafter, the Governor issued a circular headed “Board on Rates of Pay — Gold Roll”, in which his letter of March 11, 1919, was quoted and certain procedural requirements were stated in connection with the duties of the board.
Panama Canal Pilots are members of a local labor organization which is and has been affiliated with the American Federation of Labor.
12. On March 20, 1920, the Marine Superintendent of The Panama Canal replied to a request of the local pilots’ association for an increase in rate of pay, and stated in part as follows:
My reasons for not concurring with your organization in the above mentioned contention are specified at some length in my letter of April 22, 1919, addressed to Captain F. PI. Parsons, Chairman of Wage Committee of Isthmian Association No. 27.
It was understood between myself and the Committee, of your association at that time that in accepting the $337.50 rate, your association was left entirely free to appeal via the Wage Board to the Governor for a further increase; based primarily upon the Cape Cod Canal rate. Your appeal resulted in the establishment of the present rate ($375.00 per month); effective July 1,1919.
13. By letter dated September 13,1927, The Panama Canal requested the opinion of the Comptroller General as to the propriety of paying pilots additional compensation for transits of the Canal on successive days. In his reply, dated September 30, 1927, the Comptroller General stated in part as follows:
Section 4 of the act of August 24, 1912, 37 Stat. 561, expressly provides that the compensation to be paid employees in the Canal Zone shall not “exceed by more than twenty-five per centum the salary or compensation paid for the same or similar services to persons employed by the Government in continental United States.” It is stated in your submission, quoted above, that it is thought that the rate of pay proposed will not be in conflict with this restriction. I find, however, that in the “Schedule of Wages for Civil Employees under the Naval Establishment,” for the calendar year 1927, the *473 Secretary of the Navy has prescribed the following rates of pay for pilots: pilot (seagoing) and tngmaster (New York, Puget Sound and Norfolk Yards and Naval Operating Base, Hampton Boads, Virginia, only), $3,000; pilot (seagoing) all other yards, $2,700, $2,400; pilot (river), $2,020. From this it would appear that even the present rate of compensation to pilots in the Canal Zone, to wit, $4,800 per year, is in excess of the permissible 25 per cent over rates paid by the United States for similar services in this country. Accordingly, information is requested as to the particular class of employees of the Government in continental United States whose salaries or compensation formed the basis of the rate fixed for pilots in the Canal Zone. Information is desired, also, as to whether the compensation of pilots in the Canal Zone was increased pursuant to the provision in the act of December 6,1924, 43 Stat. 712.
The Panama Canal replied on October 5,1927, as follows:
There is no similarity between the position of pilot in the Panama Canal service and of pilot in the Naval service. The latter gets an occasional vessel to pilot over a short course while the former is continuously engaged in handling vessels of all types through the locks and restricted waters, the duty in each case lasting from six to fourteen hours and involving a knowledge of handling all classes of vessels under most difficult circumstances. There is no comparable position in the Government service. All pilots performing comparable service are privately employed, most of them working as members of cooperative associations, and their earnings range from $5,000 to $10,000 per year. It was not, and is not, considered fair to base Canal Zone pilots’ pay on amounts earned by association pilots, since it is thought this pay is excessive and such rates would be entirely out of coordination with rates paid to other employees of the Canal. The pay has therefore been fixed administratively as related to other employees. The unusual condition brought about by largely increased traffic which comes in spurts and necessitates at times excessive work by the pilots fully justified the proposed modification of the rate of pay.
The Comptroller General replied by letter dated October 27,1927, refusing approval of the proposal for paying additional compensation for transits on successive days, and stating in part as follows:
*474 It will be noted from my letter of September 30,1927, that the Navy wage schedule provides for three classes of pilots — that is, river pilots at $2,020 per annum, seagoing pilots at all yards and stations except those specifically named at $2,400 and $2,700 per annum, and seagoing pilots at New York, Puget Sound, Norfolk and Hampton Eoads at $3,000 per annum. These schedules are promulgated by the Secretary of the Navy pursuant to the authority contained in the act of July 16, 1862, 12 Stat. 587, now section 505, Title 34, United States Code, which provides as follows:
“Conformity of rates of pay with those of private establishments in vicinity. — The rate of wages of the employees in the navy yards shall conform, as nearly as is consistent with the public interest, with those of private establishments in the immediate vicinity of the respective yards, to be determined by the commandants of the navy yards, subject to the approval and revision of the Secretary of the Navy.”
It must be assumed that the Secretary of the Navy in promulgating this schedule complied with the statutory requirements and gave due consideration to the rates of compensation received by pilots in the vicinity of the stations in question. But be that as it may, section 4 of the act of August 24, 1912, 37 Stat. 561, makes the compensation paid by the Government to its employees in the United States the standard by which compensation in the Canal Zone shall be regulated. Said section provides that the compensation to be paid to employees m the Canal Zone shall not “exceed by more than twenty-five per centum the salary or compensation paid for the same or similar services to persons employed by the Government in continental United States.”
‡ ‡ #
14. On March 1, 1928, the Governor promulgated personnel regulations which prescribed the duties of the Wage Board and of the Salary Board of The Panama Canal. These regulations provided in material parts as follows:
33. Wage boaed
33.1. Membership. — The Wage Board, formerly known as the “Board on Eates of Pay — Gold Eoll” will be composed of 2 members; 1 appointed by the Governor and 1 nominated by the Panama Metal Trades Council and approved by the Governor. The latter member must be a bona fide employee of The Panama Canal or the Panama Eailroad.
*475 33.3. Oases handled. — Cases referred to the Board shall include, in general, those relating to hourly rates for all crafts, monthly rates derived from hourly rates, and monthly rates such as those for employees of floating equipment, in the transportation department of the Panama Kailroad, or elsewhere, which are derived from rates paid for the same or similar services in the United States. Cases involving the rates for clerical positions will not ordinarily be referred to the Board.
34. Salary board
34.1. Membership. — The Salary Board (formerly known as the “Board on Clerical and Allied Kates of Pay”) will be composed of the heads of major departments and divisions, and for the present shall consist of the Auditor, chairman; Chief Quartermaster, Chief Health Officer, Marine Superintendent, Executive Secretary, Superintendent of Panama Kailroad, Superintendent of Mechanical Division, Assistant Engineer of Maintenance and Superintendent of Dredging Division. The Labor Member of the Wage Board may participate in the deliberations of the Salary Board but will have no vote on it.
34.2. Gases handled. — Cases referred to the Salary Board will be in general, those in which adjustment is made administratively and with distinct reference to coordination rather than on the basis of direct comparison with rates for similar employment under the Government in the United States, which latter are generally referred to the Wage Board. Clerical and allied rates, and rates for supervisory positions which are not definitely coordinated with rates based directly on United States rates, will be referred to the Salary Board.
Subsequent to this date, questions relating to the compensation of pilots were never referred to the Wage Board. Such questions were presented to the Salary Board, or to some special committee established for that purpose, before which representatives of the pilots were permitted to appear.
15. Section 2 of the Welch Act, act of May 28, 1928, 45 Stat. 776, extended the coverage of the Classification Act of 1923 to employees in the field service. The Panama Canal proposed what it deemed to be proper classifications for most of its employees, but was advised by the Classification Board of the Civil Service Commission that certain groups of employees, including the pilots among others, could not be brought into the classified service. Subsequent thereto, the *476 compensation of employees so excluded from the classified service was adjusted from time to time as adjustments were made by Congress in the compensation of classified employees. The Panama Canal thus established a group of employees which were not classified employees but which it considered and treated as “related-to-classified”, among which were various service employees and the pilots.
16. On June 29, 1928, the Salary Board recommended to the Governor that the salary rate of pilots be raised from $400 to $416.67 per month. This recommendation was based upon changes which had occurred in the compensation of those employees of the Canal whose pay was fixed in relation to the provisions of the Classification Act. The Governor approved this recommendation effective July 1, 1928.
17. On February 12, 1929, Mr. H. A. McConaughey, who was the employees’ member of the Governor’s Wage Board, attended a meeting of the Salary Board, of which he was not a member. By letter dated March 5,1929, in which he stated that he had obtained the permission of the Governor to disclose the minutes of the Salary Board meeting, he advised the local pilots’ association of the various statements made concerning the claim of the pilots that their salaries should not be adjusted in relation to salaries of other employees of the Canal, but should be related to salaries of pilots in United States ports. He advised that the Governor had endorsed one statement in the minutes as representing his views, which statement was as follows:
The Chairman said he thought the trouble was that none of these Pilots on the United States with whom the Canal Pilots are undertaking to compare themselves are employed; they are members of a cooperative organization — a partnership — and the legislatures have given these organizations a right to impose arbitrary charges upon ships and they divide these among themselves— it is not a salary that they are paid at all; they only get this compensation (if it can be called compensation) by reason of the arbitrary action that they have gotten out of State Legislatures. They are not on a salary basis, no one else can come in and get employment, because the Pilots have everybody else arbitrarily shut out.
*477 Mr. McConaughey further advised the pilots’ association that the Governor had elaborated his position in a memorandum dated February 23,1929, as follows:
It is a well known fact that Pilots’ rates in the United States are kept at an artificial height by means of restrictive laws. I will not agree to base Canal rates on rates in the United States which are beyond the value of the service performed.
Mr. McConaughey’s statement that “the pilots have just as much right as any other class, profession or occupation, to request that their rates of pay should be based on 25% over what they would be in similar positions in Government service in the United States,” I thoroughly agree with; but his conclusion that, in the absence of comparable government positions, the Canal Pilots are entitled to base pay on the rate received by Pilots (under the monopolizing local laws) at United States ports, I regard as wholly untenable.
Perhaps a strict interpretation of the Panama Canal Act might require Canal rate to be based on Navy Yard Pilots rate; but I have no intention to make such interpretation, and would resist as far as I could such interpretation by Washington authorities. I do not regard the Canal Pilotage as comparable to that done by Navy Yard Pilots, any more than I regard the conditions of service of Canal Pilots as comparable to those maintained by restrictive and monopolistic laws at United States ports.
I cannot admit that the responsibility of Canal Pilots is greater than that of masters of such ships as the “Ancon” and “Cristobal” or the shipping board vessels.
In my opinion the present rate of pay is as high as we are authorized to pay; but if the Salary Board at its next meeting can by comparison with Panama Canal rates for positions of similar responsibility justify recommendation for a slight increase, I agree to give further consideration to the matter.
Mr. McConaughey further advised that he had had a personal interview with the Governor, in which the Governor had reiterated his position and stated that his present attitude was that he would consider increases in pay for pilots solely in relation to their value to the Canal as compared with other Canal employees.
18. Shortly thereafter, the Salary Board went out of existence, and the Governor subsequently appointed special *478 committees to consider and advise him on special rates of pay. These committees were not referred to as salary boards.
19. Counsel for some of the plaintiffs quoted into the record in this case, without any objection being stated, language purportedly contained on page 317 of the Closing Report of the Wage and Personnel Survey, stated to be an official document of the 71st Congress, 3rd Session, submitted to the Speaker of the House of Representatives on February 16, 1931. The quotation was as follows:
The Panama Canal has 74 Marine employees who are pilots engaged in the transit of vessels of all size and tonnage through the Panama Canal, including some probationary pilots in training who must serve an apprenticeship of a year and six months on canal harbor duty before being rated a full-fledged pilot. Compensation paid this group is based on rates paid to similar classes of employees in the continental United States and is determined by the Panama Canal “Gold Roll” Wage Board.
As stated in finding 14, the Wage Board never acted on the question of rates of pay of the pilots after March 1, 1928.
20. In 1939, the pilots again requested an increase in salary rates. This matter was referred for study to Ernest A. Erbe, an executive assistant to the Governor, who deemed it advisable to make a comprehensive study because of the periodic recurrence of the question of adequate rates of pay for pilots. His study was summarized in a memorandum to the Governor, dated February 13, 1940, with which was submitted a compilation of data concerning qualifications, duties, responsibilities, and working conditions of pilots at United States Navy yards and of pilots of The Panama Canal, with an analysis of the relative responsibility of pilots and masters of ocean-going vessels. The data covered a review of rates of pay authorized for Panama Canal pilots since 1914, rates of pay of masters of ocean-going vessels, compensation received by Navy yard pilots, and the rates of compensation received by present pilots of The Panama Canal in the positions they held immediately prior to their present employment, and a comparison of the present com *479 pensation of Panama Canal pilots with the compensation received by pilots in the United States.
Mr. Erbe stated in his memorandum in part as follows:
21. Based on the above data it may be stated that the present maximum rate of $416.67 for Pilots is:
(a) More than 25% above the maximum rate paid in any Navy Yard in the United States.
(b) The $416.67 monthly rate now authorized for Panama Canal Pilots appears to compare favorably with rates paid to Masters of ocean-going vessels of American registry (without adding the 25% increment), except for the larger passenger-cargo vessels.
(c) The present $416.67 monthly rate of compensation now authorized probably is below the average earnings of Pilots in the United States who are members of commercial pilot concerns.
(d) The $416.67 monthly rate appears to be sufficiently high to attract and hold qualified and capable sea-faring men who are able to qualify as competent Canal Pilots within 18 months following appointment.
Mr. Erbe concluded that no increase in rates of pay of pilots was justified, that harbor pilotage in The Panama Canal service was comparable to the work of pilots in the Navy yards in the United States and consideration should be given to adopting U. S. Navy rates of pay for pilots as a base for compensation rates for harbor pilots in The Panama Canal service, and that consideration should be given to reducing the number of pilots in the service of The Panama Canal.
21. Under date of September 27,1941, the Chief, Eesearch and Service Bureau, The Panama Canal, submitted a memorandum to the Canal Director of Personnel concerning rates of pay for Canal pilots. The Canal pilots were compared in detail with U. S. Navy yard pilots, and it was concluded that while Panama Canal rates had been historically above similar rates in the Navy yards, a comparison of duties and responsibilities would not justify a very large differential in favor of Canal pilots above prevailing Navy Yard rates of pay.
The Canal pilots’ rates of pay were also compared with those of masters of ocean-going vessels, masters of Army transports, captains of Panama Railroad Company vessels, *480 pilots in associations operating in United States harbors, and Federal Barge Lines pilots.
It was concluded that there was some justification for the establishment of rates of pay for Canal pilots, similar in scope to those prevailing in U. S. Navy yards; that administrative consideration might well be given to rates of pay of masters of ocean-going vessels; that rates of pay of masters of Army transports, without subsistence and without a 25 percent differential, were about equivalent to existing rates of pay for Canal pilots; that little basis existed for providing that earnings of pilots in associations operating in United States harbors should serve as a direct basis for rates of pay of Canal pilots; and that it might be administratively desirable to take cognizance of the rates of pay of pilots of the Federal Barge Lines, whose rates of pay were above those of Canal pilots, if 25 percent were added for tropical service.
22. On September 30,1941, the Director of Personnel submitted a memorandum to the Governor recommending the allocation of Canal pilot positions within the classified service of The Panama Canal, based on the comparability of duties, responsibilities and working conditions of Canal pilots with those of other classified positions in the Panama Canal and in the Federal Service generally, and recommended increase in salaries of present pilots from $416.67 to $437.50 per month.
23. By letter dated October 1, 1941, the Governor advised the Canal pilots’ association that a committee consisting of the Marine Superintendent, the Executive Secretary to the Governor, and the Executive Assistant to the Engineer of Maintenance had been appointed by him to consider the compensation of pilots in the Canal service and to make a report with appropriate recommendations. The Governor advised that all information recently assembled would be made available to the committee, and that representatives of the pilots of their own selection would be heard. The Governor further advised that the committee had been instructed to give full consideration to information and data presented or obtained from all sources.
*481 24. The “Committee” appointed by the Governor met on October 20, 1941, and held a general discussion regarding various features of the problem of Canal pilots’ salaries, the members having previously read the available material on the subject matter. The second meeting was held on October 23, 1941, and at the invitation of the committee, representatives of the Canal pilots (being four of the senior pilots) appeared before the committee and discussed at length the duties and nature of employment of pilots and the comparison between rates of pay of Canal pilots and pilots elsewhere.
The Canal pilots urged that their basic rate be a minimum of $425 per month — based upon the basic wage of Los An-geles pilots and pilots of the Federal Barge Line — plus a 25 percent differential for tropical service. The committee held further meetings for discussion and deliberation on October 25, 1941, and November 4, 1941, and on the latter date, prepared and submitted its report to the Governor, comprised of the minutes of the four meetings, with those of the fourth meeting stating in pertinent parts, as follows:
2. The Committee reviewed and discussed in detail the rates of pay and conditions of employment of pilots employed by Federal Barge Lines, pilots belonging to private pilot associations, masters of ocean-going vessels generally and masters of Panama Railroad vessels, and Navy Yard pilots. Extensive data relating to rates of pay and conditions of employment affecting these groups, and all other information and files relating to rates of pay for pilots, had previously been reviewed by each member of the Committee.
3. It was the view of the Committee that the information available as to rates of pay and conditions of employment affecting pilots, masters of vessels, and others engaged in similar occupations elsewhere does not disclose such an identity of duties, responsibilities, privileges, and other conditions of employment as would justify the adoption of the rates of any particular one of these groups as providing a justifiable base for rates for Canal pilots. The extensive information available indicates material differences in the rates of pay of the several groups referred to and the reason for the differences in rates of pay is readily found in the differing duties, responsibilities and conditions of employment affecting the several groups. These factors, with re *482 spect to Canal pilots are likewise different from those in the several other groups which have been considered and in many respects the conditions of employment affecting Canal pilots are unique and affect the Panama Canal service only. To justify the adoption of a salary scale in effect elsewhere it would be necessary to determine that duties, responsibilities, and conditions of employment are substantially the same as in the Canal service. The Committee has not found such similarity in working conditions elsewhere as would justify the adoption of salary scales prevailing elsewhere as a basis for the establishment of new rates for Canal pilots.
4. In the absence of scale of rates which could justifiably be used as a base for establishing rates for Canal pilots, the Committee feels that it is necessary to continue to establish such rates with a view (1) to providing a reasonable rate of compensation considering the duties and responsibilities of the position, the character of the services performed, and the qualifications of the employees concerned; (2) keeping such rates at a level not inconsistent with rates prevailing elsewhere for reasonably similar service, taking into consideration all factors affecting the determination of such rates; (3) preserving so far as possible a reasonable coordination with rates prevailing in the Panama Canal service for positions of similar character and responsibility.
5. Pates of pay for Canal pilots have not been adjusted since 1928. While there have been no general increases in rates for Canal personnel since 1928 it is a fact that because of within-grade or other promotions now authorized by law, the salaries of a considerable number of individual Canal employees are higher than in 1928. In 1928 a flat rate of $416.67 was established for Canal pilots at the time that general increases were made in Canal salaries by reason of the Welsh Act. No longevity or other increases were provided for. By reason of the fact that most Canal salaries are established on a graduated scale, with promotions to higher levels at regular intervals now provided by law for those maintaining satisfactory efficiency ratings, it appears to the Committee that the salaries of Canal pilots should likewise be established on a graduated scale which will provide for promotions at regular intervals for pilots maintaining satisfactory efficiency levels.
6. The Committee agreed that rates of pay for the pilot force should be re-established in the light of the principles stated above as indicated in detail in the table attached hereto.
*483 7. Under the pay schedule attached hereto, Pilots-in-Training would enter the service at an entrance rate of $300 per month, instead of the present rate of $266.67. At the expiration of six months’ satisfactory service, the Pilot-in-Training would be promoted to Pilot-Probationary at $350.00 per month, instead of $341.67 per month. After serving satisfactorily for one year the Pilot Probationary would be advanced to Pilot, Pay Grade I at $400 instead of being appointed Pilot at $416.67 as at present. After serving satisfactorily for one year in Pay Grade I, the Pilot would be advanced to Pay Grade II at $420.00 per month. Thereafter, at 5-year intervals, the pilot performing satisfactory service would be promoted successively to Pay Grades III, IV, and V, at $440, $460, and $480 per month, respectively.

Recommendation

8. The Committee recommends the adoption of the pay schedule attached hereto, effective December 1,1941, the method of application to the present force being as indicated in Notes 1 and 2. The intervals between promotions for the pilots already in service will enable arrangements to be made for securing the additional funds needed to pay the higher salaries.
9. To provide a differential between the rates paid to Pilots and to the positions of Assistant Port Captain and Pilot in Charge, Lighthouse Division, the Committee considers that the rates for each of these positions should be fixed at a rate of $20 above the highest rate actually being paid to any Pilot, adjustments to be made from time to time, as Pilots are advanced to the higher rates in the proposed pay schedule.
On November 15,1941, the Governor approved the report and recommendations of the committee and directed that the new pay schedule, summarized in the above-quoted paragraph 7 of the report, would become effective December 1.1941.
25. In the meantime, the president of the National Organization Masters, Mates and Pilots of America, by letter dated October 30, 1941, had written to the Governor from New York City with regard to rates of pay for Canal pilots, urging a rate of $500 per month. On November 15, 1941, the Governor transmitted a copy of the new Canal pilot wage schedule which was to become effective December 1.1941, and replied in part as follows:
*484 The action taken is the result of careful study by a very competent board which submitted a schedule that can be justified to any unbiased critic. I feel sure that you will be gratified by the results, to which your advice and counsel have contributed.
28. By letter dated November 22, 1941, the Canal pilots acting through their local union appealed the new wage scales to be effective December 1, 1941, to the Secretary of War. On January 6, 1942, the Governor directed a memorandum to the Secretary of War, in which he commented in detail upon the appeal and the matters involved; advised that the wages of Canal pilots were fixed administratively and not by negotiation; explained that his committee considered the data submitted by the pilots and weighed and evaluated it in connection with all other available data; and stated that the recommendations of the committee were approved by him without change, as representing the best judgment of the Canal Administration concerning the appropriate rates of pay for the services of the pilots.
27. On January 10, 1945, the Canal pilots wrote a letter to the Governor requesting a salary increase to $875 per month, stating in part as follows:
The Canal Zone Pilots have instructed their Executive Committee to secure data and to take all necessary steps for a salary raise to conform to piloting in the United States. Considerable study of our files have shown that the main obstacles have been;
1. The attempt to coordinate our salaries with that of other canal workers; rather than with the salaries that are in effect, in similar work in the United States.
2. The refusal of the Canal Administration to grant us a yardstick or basis for pay, from the United States as other employees have.
Past administrations have refused to adjust our salary to that of Pilots in the United States, because their income was received from “arbitrarily levied fees.” These fees are set with the full knowledge of the powerful steamship owners association, who could stop it if unjust. For 30 years the pilots have been trying to have their professional status and value to the Canal established. The last two years alone, should have placed this value.
*485 This request was denied by the Governor under date of January 20, 1945, in a letter which reviewed in detail the considerations, conclusions and recommendations of the Governor’s 1941 committee, and which stated in part:
I do not consider that there is any justification whatsoever for authorizing a rate of $875.00 per month as recommended in your letter. As you must be aware, no employee or official of The Panama Canal receives compensation at so high a rate, and the rate is in excess of that of many of the higher ranking officers of the United States Navy and Army actually engaged in combat service. Nates for particular groups of Canal and Eailroad employees obviously cannot be established without regard to rates for other positions of similar character or degree of responsibilities, and the rates recommended by you are quite considerably out of coordination with other rates in The Panama Canal service.
28. By letters dated January 26, February 12, and May 5, 1945, the Canal pilots appealed directly to the Secretary of War for an increase in salaries on the basis of salaries received by pilots in the continental United States or the Suez Canal. By memoranda dated March 22 and June 2, 1945, to the Secretary of War, the Governor explained in detail the criteria used in fixing the prevailing wage scale, which became effective December 1, 1941 and recommended replies to the Canal pilots’ requests in accordance with attached drafts. Using the language of the drafts prepared by the Governor, the Secretary of War by letters dated April 16 and June 25, 1945, rejected the requests of the Canal pilote for salary increase.
29. On June 21,1945, the Governor appointed a committee to review the provisions of new pay legislation (Federal Employees Pay Act of 1945) and to consider its effect on pay rates of Canal employees.
On June 30, 1945, the committee submitted a detailed report to the Governor, recommending certain percentage increases for classified employees and equivalent increases for certain listed “unclassified employees whose rates of pay are closely coordinated with rates of pay in effect for classified employees.” The Canal pilots were listed in the latter cate *486 gory. The percentage increases on classified employees were set forth as 20 percent on the first $1,200 of annual salary, 10 percent on the portion of salary between $1,200 and $4,600, and 5 percent on that portion over $4,600, with the limitation that their combined basic salary and overtime pay not exceed $10,000 per annum. Specific recommendations contained in the committee report are in part as follows:
8. Pilots and related employees: This group of employees also is included in Schedule A. The committee has applied the 20%, 10%, and 5% increases to present rates, and then rounded out these rates to give a schedule of biweekly rates of pay ranging from $210 to $260. Biweekly rates for the Asst. Port Captains will be $270. This schedule meets with the approval of the Marine Superintendent, and its adoption is recommended.
9. In lieu of overtime compensation, the pilots have heretofore been paid 15% of their authorized rates of pay. Compensation for overtime cannot be continued on this basis, and the Committee is of the opinion that accurate records should be kept of the actual hours worked by the Pilots and that they be paid overtime therefor for all time worked in excess of forty hours weekly in conformity with the overtime compensation schedules authorized for classified employees. An alternative procedure would be for you to authorize an administrative 48-hour work week for all pilots if conditions seem to so warrant.
17. Floating equipment employees: Base compensation rates of these employees are not affected by the provisions of the Federal Employees Pay Act of 1945 but the overtime compensation of these employees may be affected. Pending clarification of whether overtime compensation should be paid on the same basis as that which will apply to “wage board” groups of employees or whether they should be paid on the same basis as for “classified employees,” the Committee is of the opinion that since the latter provides the lower overtime pay the “classified” overtime pay method should prevail until such time as authoritative rulings are received in regard to the appropriate method of computing overtime payments for these employees.
26. While the information available does not leave the matter entirely free of doubt, it appears that the night differential perhaps will not apply to employment of an intermittent character, such as that which will be *487 worked by pilots, or by employees in the Balboa Heights Library where the two hours’ night work is shared by several employees assigned on a rotating schedule.
The Governor approved the recommendations contained in the committee report, effective July 1,1945.
30. Report No. 726, House of Representatives, 79th Congress, 1st Session, concerning HR 3393, which later was passed as the Federal Employees Pay Act of 1945, stated as follows with respect to Section 203 of the Bill:
This section covers about 150 thousand employees whose basic compensation is fixed and adjusted from time to time on a per annum or monthly basis by wage boards or similar administrative authority serving the same purpose. These employes, except in the Government Printing Office and the Tennessee Valley Authority, were specifically included within the War Overtime Pay Act of 1943, because at that time they were not regarded as falling within the Act of March 28, 1934, which provides true time and one-half rates for similar employees paid at hourly or daily rates.
Since that time, however, the Supreme Court of the United States, in U. S. v. Townsley, 323 U. S. 557, January 15, 1945, has decided (1) that Section 23 of the Act of March 28,1934, in so far as it applies to overtime pay, covers wage-schedule employees whose base pay is fixed on a monthly basis; and (2) that the proper method of computing such overtime compensation for employees paid on a monthly basis is first to multiply the monthly rate by 12 and divide the product by 260, i. e., 52 times 5. This gives the straight-time daily rate, which is multiplied by one and one-half to derive the overtime rate for one day of eight hours.
The committee believes it to be sound to treat the monthly and per annum wage-schedule employees in the same way as per diem and hourly wage-schedule employees are treated under the Act of March 28, 1934. The fundamental criterion should be the method by which the basic rates are established, and differences in overtime pay treatment should not rest on whether such rates are administratively expressed in terms of an hour, a day, a month, or a year.
31. The Federal Employees Pay Act of 1946 provided further increases in the pay of classified employees. Effective July 1,1946, The Panama Canal applied the same percentages to the existing pay scale of its group designated by *488 it as “related-to-classified,” in which were included the pilots, and thereby increased the scale for pilots to a range from $4,685.40 to $7,680.75. The basic memorandum with respect to this change was prepared by the Assistant Director of Personnel, and stated in part:
1. Reference is made to memorandum of June 30, 1945, and especially to paragraphs 4 and 5, concerning recommendation and reasons for increasing rates of pay of various positions. When the rates for classified positions were increased in July 1945, rates for other positions were increased accordingly for the following reasons:
(a) They had duties similar to those of classified positions as established by the Civil Service Commission,' and/or
(b) Their rates were not tied to, or adjusted along with, any other than classified group on the Isthmus. All the positions listed on the attached sheets fall in either 2(a) or 2(b) [sic] above, and it is believed that it would be equitable to give them identical treatment with the classified employees this year.
2. There was a somewhat lengthy consideration of the pilot group last July, but as they were not directly tied to any other group of employees, and were not therefore benefiting from any other pay increases, it was decided to give them the increase received by classified employees. These employees are included in the related-to-classified group again this year on the basis that there has been no material change in policy concerning them.
32. Congress again increased the rates of compensation of classified employees effective July 1,1948. By action of the Governor, The Panama Canal applied the same increase to its related-to-classified group of employees, and thereby increased the pilots’ salaries to a range from $5,097.90 per year for a pilot-in-training to $8,093.25 for a pilot with over 20 years of service, effective July 11, 1948.
33. By letter dated August 11, 1948, the Canal pilots requested the Governor to grant them a salary increase of 15 percent through all pilot grades, stating that even after the increase on July 11,1948, the lowest paid ship master in the merchant marine received a salary in excess of a senior Canal pilot. The pilots further requested that the longevity raises effective .every 5 years until 20 years of service be revised to advances every 2 years throughout the pilots’ employment.
*489 After a study and memorandum report bad been made by a member of bis staff, tbe Governor, on November 26, 1948, appointed a special board comprised of four executive officers of Tbe Panama Canal. This board met on December 14,1948, and beard tbe Canal pilots’ request for salary increases, as initiated by tbeir letter of August 11,1948. Two senior pilots appeared as representatives of tbe Canal pilots, one of whom discussed in considerable detail the pilots’ request that their salary rates be made comparable to those of masters of American-flag commercial ships. Tbe recommendations of this board, submitted to the Governor on January 13, 1949, stated in part as follows:
This board is of tbe opinion that little basis exists for tbe rates of pay of Masters of Ocean-going Vessels being used as a direct base for rates of pay of Canal Pilots. Tbe duties in many respects are similar but the responsibilities, particularly those of an administrative nature; are much different. Further, that the working conditions, hours away from home, responsibility for material (cargo and ships appurtenances), and for the performance of subordinate personnel vary greatly as between the shipmaster and the pilot.
The special committee meeting with the pilots in 1941 fixed their pay at rates commensurate with the duties and responsibilities of pilots and in coordination with pay schedules of other Canal employees in the Classified and Delated Groups. The rates of pay of pilots, after completion of the probationary period was fixed slightly above the CAF-11 and P-4 entrance rates and extends upward to the intermediate rates for CAF-12 and P-5 as a maximum. This is considered an equitable position for the pilots having due regard to the relative educational, technical knowledge, and experience factors necessary to prepare the individuals for capable performance in positions falling within these Classified and Delated (pilot) Groups in the Canal organization. The interval between advances was fixed at five years after Grade II and extends up to a maximum upon the completion of twenty years Canal service. There is no basis, in the opinion of the board, for any change in the relative position of the pilots’ pay schedule with reference to pay schedules of other Classified and De-lated employees. However, it is believed that the interval between increases should be reduced.
There has been a marked increase in pay schedules throughout the maritime industry since 1941. There has *490 also been a large and general wage and salary advance throughout private industry and government departments and establishments as is evident in pay increases which have accrued to pilots, quoted in Marine Superintendent’s letter, contained in Enclosure (A). These increases were the result of legislative action prompted by the general wage advances which have occurred. Further advances to the pilots and to the entire Classified and Related Groups can be and are expected if the trend upward continues. To increase pilots’ basic pay as a distinct and separate group and then to have legislative advances granted them in the immediate future obviously would be unfair to the government, particularly when the reason for such increase is prompted only by the rise in maritime wages, which trend seems common to commercial rates of pay in general. The remedy is legislative action applying to pay schedules of all Classified and Related Groups, including the pilots. To remove the pilots from the Classified and Related Groups would be administratively unsound and removing them from the benefits of legislative advances probably would work to their disadvantage in the long run.
Recommendation
Therefore, it is recommended that no change in basic pay schedules or the classification of pilots be made at this time but that the following schedule of increases be made effective:
Pilot Group:
Pilot-in-Training (6 months)-$5,097.90
Pilot, Probationary (1 year)- 5,850.30
Pilot Grade I (over 1% years)- 6, 602. 70
Grade II (over 2% years)_ 6,903.66
Grade III (over 5 years)_ 7,204. 62
Grade Ilia (over 7% years)_ 7,355.12
■Grade IV (over 10 years)_ 7,505.58
Grade IVa (over 12% years)_ 7, 655. 27
Grade V (over 15 years)_ 7, 805.97
Grade Va (over 17% years)_ 7,949.61
Grade VI (over 20 years)- 8,093.25
The board’s recommendations were approved by the Governor on January 20,1949, effective June 26,1949. The Governor by letter dated February 8,1949, advised the president of the local association of Canal pilots of the new schedule of rates for pilots, and stated further that little or no basis existed for establishing rates for Canal pilots on a direct parity with *491 the rates for masters of ocean-going vessels, that no other service closely similar to that of the Canal pilots appeared to exist, and that the factors for the determination of rates for the Canal pilots had not changed significantly in the past several years.
34. On October 26, 1949, after the Classification Act of 1949 had passed Congress and while it was awaiting the eventual approval of the President on October 28, 1949, the Wage and Classification Bureau of The Panama Canal recommended to the Director of Personnel of The Panama Canal that the Civil Service Commission be requested to except the Canal pilots from the provisions of the bill, and that the pilots’ rates of pay be adjusted by averaging the increases for all steps of the new grades GS-11 and GS-12 and adding that average increase to each of the present rates for pilots.
On October 81,1949, the Special Assistant to the Governor in a memorandum recommended to the Governor in pertinent part as follows:
(C) Pilots:
8. Suggested course of action:
(a) That an early decision be obtained from the Civil Service Commission regarding
(1) Whether these positions will have to be brought ■under the classification, or may be carried at rates of pay outside of the classification.
(2) If carried at rates of pay outside of the classification whether
(a) We may properly continue to credit “standby” and travel time as working time in instances whether the aggregate time credited to the pilot in a 24-hour period is in excess of 8 hours; and
(5) Where the aggregate time credited to a pilot (including working, standby, and travel time) exceeds 40 hours weekly, whether time in excess of 40 hours will be paid at true time and one-half (as for wage board employees), or otherwise.
(b) Pending determination of (a) preceding, it is suggested that pay adjustments be withheld. The Marine Superintendent and the Director of Personnel should give further study for these rates and submit recommendations thereon.
*492 On November 2, 1949, the General Counsel for the Canal commented to the Governor on the procedure suggested by the Special Assistant, in part as follows:
8. Pilots: He suggests that an early decision be obtained. from the Commission on the question whether pilots will have to be brought within the classification, or may be carried at rates of pay outside of the classification. This office recommends that the Canal propose to the Commission that pilots be placed within the classification as of an appropriate future date to be fixed by the Commission. In reporting on this bill, the Governor proposed the specific exception of pilots. However, that exception was not incorporated in the Act. The Chairman of the Commission, by letter of September 27th to the Budget Bureau, said in effect that pilots might possibly be considered excepted under section 202 (7), re craft or wage board employees, or under section 202 (8), officers and members of the crews of vessels. However, that would make wage board employees out of the pilots, and entitle them to true time and one-half for overtime under the Federal Employees Pay Act (sec. 203 as amended). Pilots have never been regarded as wage board employees; moreover, their pay has not been fixed “in accordance with prevailing rates and practices in the maritime industry” (sec. 202 (8) ox this Act). It would not seem to be desirable to obtain their exception under sections 202 (7) and 202 (8) of this Act.
He further appears to suggest that a decision also be obtained from the Commission respecting standby and travel time and overtime. I do not see that such questions are for determination by the Commission. If pilots are excepted from this Act on the basis of section 202 (7) or 202 (8), then I think they would be wage board employees and subject to the true overtime provisions of the Federal Employees Pay Act. If they, on the other hand, are included in the classification then they would be subject to the same overtime provisions as at present, namely, the restricted overtime provided for the classified employees.
35. On November 9, 1949, the Director of Personnel recommended to the Governor that no immediate change in rates of pay of pilots be made because of the Classification Act of 1949, but that the question be reviewed for later recommendation. This was approved by the Governor on November 10,1949.
*493 36. By memorandum dated December 2,1949, the Director of Personnel submitted to the Marine Superintendent for review and comment drafts of job descriptions of the positions of Canal Pilots. He commented that regarding positions which were not under classification immediately prior to the enactment of the Classification Act of 1949, but which were subject to the Act, that the Civil Service Commission had issued instructions to submit descriptions of such positions in connection with determination of appropriate classification grades.
On December 29,1949, the Marine Superintendent advised the Governor that employees other than pilots had received pay raises under the Classification Act of 1949, action being withheld on the pilots because of the doubt existing as to whether they would be classified or become wage board employees. He strongly recommended that the positions of pilots be classified.
In a memorandum dated March 7, 1950, the Special Assistant to the Governor stated in part as follows:
5. Inasmuch as The Panama Canal administration proposes to place pilots under the classification, and since the pilots have expressed a desire to be placed in the wage board group of employees, the job descriptions as finally forwarded to the Civil Service Commission should be meticulously checked by both the Personnel Division and the Marine Division to insure that they are accurate in all respects and that all supplemental information of a pertinent character is forwarded with the job descriptions.
37. By memorandum to the Governor, dated March 10, 1950, the Classification Committee of The Panama Canal recommended that with respect to the Canal pilots the job descriptions jointly prepared by the Personnel Division and the Marine Division be forwarded to the Civil Service Commission, together with the job description prepared by the pilots and other data pertaining to the pilots. This committee also recommended allocation of qualified pilots to Grade GS-11, with probationary pilots and pilots-in-training allocated to grades as determined by the Civil Service Commission. The Governor approved these recommendations on March 13,1950.
*494 38. By letter dated March 14,1950, the Canal pilots’ association advised the Position Classifiers of the Civil Service Commission of the duties and responsibilities of the Canal pilots, requested consideration of salaries paid pilots on the east, west and Gulf coasts of the continental United States and application of the 25 percent differential for tropical service, suggested that consideration be given to salaries paid to Suez Canal pilots, and offered to send one or more pilots at the expense of their association to Washington, D. C., to provide additional explanation or more detailed information.
By letter dated March 29, 1950, the Chief, Personnel Classification Division, Civil Service Commission, replied to the Canal pilots’ association, and advised in pertinent part as follows:
When the Classification Act of 1949 was in the form of bills before the Senate and House Committees on Post Office and Civil Service, the Governor of the Panama Canal and the Secretary of the Army recommended to the committees that the position of pilot be specifically mentioned among the exemptions from the Act. The Civil Service Commission concurred in that policy., but in the final drafting of the bill it was felt that either paragraph (7) or paragraph (8) of section 202 would cover this exemption and therefore the specific mention of pilots in section 202 was not necessary.
It was the understanding of all concerned therefore that the pilots of the Panama Canal would not be brought within the Classification Act of 1949 but would remain in the so-called “ungraded” or wage-schedule category. This would be the official interpretation of the Commission of course, which has the final authority to determine inclusions and exclusions by virtue of section 203 of the Act. If we were to make a formal ruling, we probably would state that the exemptions would be considered to be under paragraph (8) of section 202.
In or prior to April 1950 the Canal authorities learned informally that the Civil Service Commission was of the opinion that the Canal pilots were excluded from coverage by Section 202 (8) of the Classification Act of 1949.
39. By letter dated May 24, 1950, the Chief, Office of Industrial Eelations, Department of the Navy, responded to a request of the Canal Personnel Division for information *495 concerning pilots and other employees on floating equipment, and, limiting his statements to civilian employees carried in ratings applied only to harbor craft at Navy field activities, advised in pertinent part, as follows:
Employees in the Maritime Service are excluded from the coverage of the Classification Act of 1949 by Section 202. Prior to the enactment of the Classification Act of 1949, such employees were excluded from the coverage of the Classification Act of 1923 as amended, by Section 5 thereof.
Employees in the Maritime Service are wage board employees. Wage rates are fixed by the Secretary of the Navy or by his direction, through wage board procedures under authority in the Act of July 16, 1862 (12 Stat. 587 34 U. S. C. 505), which requires that wages shall conform, as nearly as is consistent with the public interest, with those of private establishments in the vicinity. Overtime is paid to such employees under the provisions of Section 23 of the Act of March 28, 1934 (48 Stat. 522; 5 U. S. C. 673c).
There are enclosed herewith one copy each of the schedules of wages for nine separate areas within the United States within which Maritime Service ratings are used. While “Pilots” (Pilot Seagoing and Tug Master) are included with other Maritime Service ratings for wage fixing purposes, rates of pay for Pilot Seagoing and Tug Master and other supervisory (Group IVa) ratings, do not appear on the enclosed schedules for the reasons that (a) rates of pay for these supervisory ratings are fairly uniform, and (b) adjustment in pay rates usually is by administrative action rather than through wage board procedure. Such administrative action is based on the average increase granted the non-supervisory ratings. Pates for these supervisory Maritime Service ratings are shown in the enclosed circular of 30 March 1949, Field Classification Instruction 400:20. Present regulations provide that a Chief Pilot “receive $400 per annum more than “Pilot” (Pilot Seagoing and Tugmaster).
40. On July 17, 1950, the Canal wrote to the Civil Service Commission and expressed reasons why it was considered that the Canal pilots were not excluded from coverage by Sections 202 (7) and 202 (8) of the Classification Act of 1949, and stated in part as follows:
*496 It is not believed that Panama Canal pilots, whose duties are maritime in nature, can properly be regarded as. employees in a recognized trade or craft or other skilled mechanical craft or as employees in a manual labor occupation. Employees excluded from the coverage of the Classification Act of 1949 under section 202 (7) are employees whose hours of work and overtime compensation are governed by section 23 of the Independent Offices Appropriation Act,. 1934 (5 U. S. C. 673c). Panama Canal pilots have not been included within the scope of that section. In this connection, see 35 OP. Atty. Gen. 73, to the effect that Panama Canal pilots are not laborers or mechanics within the meaning of the Eight Hour Law.
The provisions of the various laws governing or affecting the compensation of vessel employees of the Government, on which section 202 (8) of the Classification Act of 1949 appears to be based, indicate that the phrase, “officers ana members of crews of vessels”, as used in that section, refers to employees on Government vessels and does not include Panama Canal pilots.
The exclusion of officers and members of crews of vessels from the provisions of the Classification Act of 1949 follows the somewhat similar exclusionary provisions in the Federal Employees Pay Act of 1945. Section 102 (b) of the 1945 Act excluded from the coverage of certain sections of that Act individuals to whom the provisions of section 1 (a) of the Classification Act of March 24, 1943 (57 Stat. 45), applied. The Act of March 24, 1943, extended to officers and members of crews employed as employees of the United States through the War Shipping Administration on merchant vessels, all the rights, benefits, exemptions, privileges and liabilities of seamen on privately owned vessels in certain respects including] collection of wages. The Act was a temporary wartime measure made necessary by the operation of the entire merchant fleet by the Government during World War II (See 1 Benedict on Admiralty (1948 Supplement), section 189, p. 82). Section 102 (d) of the Federal Employees Pay Act of 1945 also excluded from the coverage of certain sections of the Act employees of the-Transportation Corps of the Army on vessels operated by the United States and vessel employees of the Coast and Geodetic Survey., the Department of the Interior and the Panama Railroad Company. Panama Canal pilots were not excluded from the coverage of the 1945 Pay Act. As to the vessel employees of the Government agencies *497 excluded by section 102 (d) of the 1945 Act, it was provided in section 606 that such employees “may” be compensated in accordance with the wage practices of the maritime industry. Employees of the War Shipping Administration on merchant vessels operated by the Government during the war who were covered by the Classification Act of March 24, 1943, were, of course, so compensated.
It is considered that the employees excluded from the coverage of the Classification Act of 1949 by section 202 (8) were the same classes of employees as were excluded from the coverage of the 1945 Pay Act to which reference is made above. In accomplishing tins exclusion and generalizing the language employed, the Classification Act of 1949 refers to officers and members of crews of vessels “whose compensation shall be fixed and adjusted from time to time as nearly as is consistent with the public interest in accordance with prevailing rates and practices in the maritime industry.” (Emphasis supplied.) While such requirement may be appropriate for officers and members of crews employed by the Government on Government vessels, the same considerations do not apply to Government employees whose duties take them on privately operated vessels fully manned by officers and crews employed by the private owner.
Panama Canal pilots are regular employees of The Panama Canal. They are not regularly employed on Government ships as such but the use of the services of these pilots by all vessels transiting the Panama Canal is required by Executive Order of the President. Executive Order 4314 of September 25, 1925, as amended by Executive Order No. 9227 of August 19, 1942, Rule 26. The provisions of Executive Order No. 4314, as amended, prescribing rules governing the navigation of the Panama Canal and adjacent waters are published in a pamphlet entitled, “Rules and Regulations Governing the Navigation of the Panama Canal and Adjacent Waters,” a copy of which is attached.
H* # sH * *
Although section 202 (8) of the Classification Act of 1949 refers to prevailing rates and practices in the maritime industry as a standard for the establishment and adjustment of compensation of officers and members of crews of vessels excluded from the coverage of the Act, the rates of pay of Panama Canal pilots do not bear a direct relation to the rates of pay of pilots in the maritime industry in the United States. Exten *498 sive studies indicate that the rates of pay of pilots in the maritime industry in the United States would be an unsatisfactory guide for establishing the rates of Panama Canal pilots because the duties and responsibilities of the positions are not comparable. As indicated by the foregoing discussion, Panama Canal pilots are within the coverage of the provisions of the Federal Employee Pay Act of 1945.
The Chairman of the Civil Service Commission replied by letter dated August 11,1950, in evidence as plaintiffs’ exhibit 19, and after a detailed analysis in which it was stated among other things that The Panama Canal had requested in Congressional hearings that Section 202 of the Classification Act of 1949 be amended so as to provide specifically that Canal pilots be excluded from the coverage of the bills, stated the conclusion of the Civil Service Commission, as follows:
For these reasons we conclude that, while a Panama Canal pilot is not a permanent member of a crew in the sense of a person who has signed articles for an entire voyage, he is a maritime worker engaged in the navigation of the vessel afloat and is employed in furtherance of the main object of the enterprise — to get safely from one port to another. And to that extent, a Panama Canal pilot is both an officer and a member of the crew. We have thus decided that positions of Panama Canal pilots are excluded from the Classification Act under Section 202 (8). With reference to another matter discussed in your letter, the Commission would point out that The Panama Canal is not required to pay these positions the prevailing rate in the maritime industry. The requirement of the law is conditioned by the phrase” ... as nearly as is consistent with the public interest in accordance with . . . etc.”
With respect to the Federal Employees Pay Act of 1945 and the Classification Act of 1949, the Civil Service Commission commented in the last above-quoted letter, as follows:
We note that much of the argument in your letter is based upon the wording of the Federal Employees Pay Act of 1945, and the fact that Panama Canal pilots were not excluded therefrom, even though there was a section specifically covering vessel employees. A good many of the provisions of that Act covered positions which were not subj ect to the Classification Act. Section 102 (d) was not a blanket exclusion of vessel employees, but only those of specifically named agencies. The fact *499 that no others were mentioned therein in no way indicates that there were no other vessel employees. Note that the amendment of that Section in Section 8 (a) of the Federal Employees Pay Act of 1946 named the vessel employees of the Department of the Interior which, for one year, were subject to the Pay Act of 1945. Section 102 (d) of the 1945 Act, therefore, was not a declaration that there were no other vessel employees, but, on the contrary, was a statement specifically excluding certain specific vessel employees. A case for the inclusion of these positions under the Classification Act cannot be built upon their treatment in the Federal Employees Pay Act of 1945. The question whether these positions in your agency were or were not subject to the Classification Act did not arise in the 1945 enactment, as it did not arise in connection with vessel employees of certain other agencies.
* # sfr # #
It was the intention of the framers and sponsors. of the Classification Act of 1949, both in the administration and in the Congress, that maritime work generally should be excluded from the Classification Act. Moreover, as indicated in the preceding synopsis, such also was the intention of The Panama Canal with respect to the Panama Canal pilots. Maritime work not directly related to the operation and navigation of ships, and which was in the trades, crafts,'and other manual-labor occupations connected with the maritime industry was to be, and is, excluded from that Act under Section 202 (7). Work directly related to the operation and navigation of ships was to be excluded under Section 202 (8). We agree that pilots of The Panama Canal are not properly excluded under Section 202 (7), but their exclusion under section 202 (8) is proper.
41. By letter dated September 11, 1950, the Canal pilots’ association advised the Governor that it had learned that the Civil Service Commission had excluded the pilots from the provisions of the Classification Act of 1949, stated that it was assumed that this decision was based on an interpretation of Section 202 (8) of the Act, and requested advice as to whether plans were being made for readjustment of past overtime pay for pilots in conformity with Section 203 of the Federal Employees Pay Act of 1945.
By letter dated September 15, 1950, the Governor replied to the pilots’ association, and stated in part as follows:
*500 Panama Canal Pilots have been receiving overtime compensation for work in excess of 40 hours per week under Section 201 of the Federal Employees’ Pay Act of 1945. The present determination by the Civil Service Commission that this group of employees is excluded from the Classification Act of 1949 does not alter this status. The ruling has given rise, however, to certain questions concerning the basis upon which the compensation of Panama Canal Pilots is fixed — to the extent that a change in the procedure for determining such compensation may have been prescribed by the 1949 Act.
These questions, which relate to timing, the method of determining basic compensation, and other pertinent matters, have been submitted to the Comptroller General of the United States for a definitive ruling, and when it is received, the matter will be given further consideration. Meanwhile, no change is contemplated in the status of the Pilots.
42. On September 5, 1950, the Governor of The Panama Canal submitted to the Comptroller General for decision certain questions arising as a result of the decision of the Civil Service Commission. By letter dated October 16,1950, 80 Comp. Gen. 158, the Comptroller General replied and ruled that in the light of the decision of the Civil Service Commission, the effect of the last clause of Section 202 (8) of the Classification Act of 1949 was to require that the basic compensation of the Canal pilots be fixed and adjusted from time to time in accordance with prevailing rates and practices in the maritime industry, subject only to the discretion which may be embodied in the term “as nearly as is consistent with the public interest.” The Comptroller General also ruled that the language of Section 202 (8) must be held to require the fixing of all elements of compensation, including overtime compensation, in accordance with practices in the maritime industry, as nearly as was consistent with the public interest. These rulings concluded with the following statement:
While, as indicated in your letter, under section 1105 (a) (2) of the Classification Act of 1949, 63 Stat. 972, the provisions of that act respecting the class of employees here involved became effective on the date of enactment thereof — -October 28, 1949 — nevertheless, since some lapse of time to effectuate any changes con *501 templated by the law would have occurred in any event and since it appears that the delay to the present time has been occasioned by the doubt whether section 202 (8) was applicable to Panama Canal pilots, this Office will interpose no objection to the continuance of otherwise proper former practices for a reasonable period, pending the taking of the necessary administrative action to adjust the compensation of this class of employees to accord with said section 202 (8).
43. The officials of The Panama Canal thereupon undertook a study of the basis for setting the compensation of the Canal pilots. Among other sources of information, the Canal staff contacted the Office of Industrial Eelations, Department of the Navy, and by letter dated February 8, 1951, requested information as to the basis for fixing rates of pay of Navy pilots administratively and not in accordance with wages in the martime industry. The Canal also requested the Navy to supply job descriptions of pilots and a current schedule of wages of Navy pilots at each of the Navy establishments. In this letter, the Canal authorities stated as follows:
Positions of officers and members of crews of vessels of the Military Sea Transportation Service are believed to be excluded from the Classification Act of 1949 by Section 202 (8) of that Act, and their rates of pay fixed, pursuant to the provisions of that Section, in accordance with the wages and practices in the maritime industry. Positions of Pilot (Group IV a) in the Navy are believed also excluded from the Classification Act of 1949 by Section 202 (8). However, according to the letter to you from the Chief, Office of Industrial Eelations, May 24,1950 (OIE 415: wh (731)), the positions of Pilots are considered wage board positions, and their rates of pay are adjusted by administrative action and not in accordance with the wages in the maritime industry.
On February 16, 1951, the Wage and Classification Division, Office of Industrial Eelations, Department of the Navy, supplied a schedule of current rates of pay for all categories of Navy pilots assigned to the continental United States, and by letter stated in part as follows:
The basic authority for fixing pay rates of employees in trades and occupations in naval field activities is the *502 Act of July 16, 1862 (12 Stat. 58?; 84 U. S. C. 505). This law requires that wages shall conform, as nearly as is consistent with the public interest, with those of private establishments in the immediate vicinity.
For many years the Department of the Navy has considered employees on harbor craft at its various field activities to be in the category of “trades and occupations” and has fixed their rates of pay accordingly. During the general wage survey in 1940, an effort was made to obtain wage data for such ratings as pilot, seagoing and tugmaster, river pilot, etc. For a period of more than six years thereafter, wage rates were stabilized. The wage information secured in the 1940 survey for the ratings above mentioned was considered to be generally inadequate. For this reason, no attempt has been made to secure wage data for the past four years subsequent to the stabilization period. The Department has followed the policy of granting increases for these ratings approximately equivalent to the general over-all average increase received by the shipyard trades and occupations as the result of general wage surveys.
The Department has noted the decision of the Comptroller General to the Governor of the Panama Canal (B-98054 of 16 October 1950) wherein it was ruled that Panama Canal pilots are covered by section 202 (8) of the Classification Act of 1949. In view of the language of the 1862 Act, above mentioned, the Department has not determined that pilots and similar employees aboard harbor craft are — ‘“officers and members of crews of vessels” within the meaning of section 202 (8).
44. After material had been accumulated and the problem studied, a full report was prepared by The Panama Canal. This report contained a brief history of the fixing of rates of pay of Canal pilots, a list of the sources of information obtained in the study, a discussion of the data obtained, a review of the demands being made by the Canal pilots, and an explanation and discussion of a proposed wage structure, together with recommendations as to what action should be taken.
On February 28,1951, the Governor submitted this report to the Canal pilots’ association for review, and invited representatives of the organization to meet with him to discuss the study and the proposed future rates of pay.
*503 45. A number of meetings followed between representa-tatives of the Canal pilots, the Marine Superintendent, the Personnel Director, and on two or three occasions, with the Governor. By letter dated April 28, 1951, the Canal pilots’ association advised the Governor as follows:
At your meeting with the Pilots’ Committee on April 13th, 1951, a proposal was mentioned to the effect that our salary adjustment might possibly be settled by classification in the Civil Service or in relation to it.
All of the Pilots have been informed of this proposal and it is their desire that this Association go on record as being definitely opposed to any such plan.
Maritime employees of the Government have been excluded from classification due to the difficulty of applying Civil Service rules to their work and we wish to reaffirm our desire to be compensated according to the prevailing rates and practices in the Maritime Industry, as provided by law.
46. On May 27, 1951, a new scale of compensation for Canal pilots was adopted by the Governor. This plan was based upon the amounts paid masters of ocean-going vessels, as set forth in wage agreements entered into by the Masters, Mates and Pilots organization and the shipping companies of the United States, pertaining to the east, west and Gulf coasts of the continental United States, and as those rates of pay were reflected in the rates paid in the Military Sea Transportation Service of the Department of the Navy.
47. Rates of pay of Canal pilots were fixed from time to time by the Governor on the basis of studies and recommendations of a wage board, salary board or special committee appointed by the Governor. No pilot was a member of such board or committee, but representatives of the pilots were permitted to appear before the special committee or board.
48. As previously mentioned in finding 8, Canal pilots usually made transits of the Canal on alternate days, with occasional transits on successive days and with some instances when two days would elapse between transits. It occasionally happened that a pilot would be called by telephone in the morning of a day when he was not scheduled for transit duty, and directed to “stand by” for a transit at a specified hour later in the same day. The pilot was required to be available at the hour designated, although he might be *504 called in advance and advised that his services would not be necessary. He was not required to remain in his home or restricted in his activities except to the extent that he be available for a cancellation call or to be picked up by a limousine and transported to arrive at the dock or the Port Captain’s office at the designated time. The pilot was not credited and paid for the time in “stand by” status unless he was directed to and did “stand by” at the dock or the Port Captain’s office. If a pilot had been previously telephoned to “stand by” for a designated hour, and thereafter received a call postponing the time to report until a later hour, he then had the option to report at the dock or Port Captain’s office at the time first designated, at which time he was considered to be on duty and credited and paid for time spent by him in a “stand by” status while awaiting commencement of transit duties.
49. Each Canal pilot was granted an arbitrary allowance of time after each transit to return to his home on the other side of the Isthmus. Starting on July 1,1945, this allowance was two and one-half hours, and this was reduced on December 10,1946, to two hours and twenty minutes. The evidence does not establish whether this was more or less than the actual or average amount of time which transpired between completion of a transit and return to home port. About four trains per day crossed the Isthmus in each direction, but the scheduling of transits was such that only two trains, one at about 4:40 p. m., and the other at about 10: 00 p. m., were of use to the pilots. In addition, the Panama Canal provided a number of autmobiles for transportation of pilots back across the Isthmus. The frequency of these trips is not shown in the evidence. With respect to availability of automobile transportation upon completion of a transit, one of the three pilots who testified in this case, stated: “Sometimes we got one soon, sometimes you may have to wait an hour, or a couple of hours.” He stated further: “It was a sedan or station wagon or something to ride us back across the Isthmus to our home on the other side, a certain number of them every day. They used to wait on us. Probably at least two cars would go back and ride us home.” There 'was no other evidence as to amounts of time spent in waiting for transportation by automobile. *505 About one and one-half hours of actual driving were required to cross the Isthmus by automobile.
After a pilot had recorded a total of 40 hours of service in one week, including transit time, travel time, and allowable stand-by time, he was given no further allowance for travel in that week, even though he may have had to make a return trip across the Isthmus after completion of 40 hours of service.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are entitled to recover, and judgment will be entered to that effect. The amount of recovery, if any, will be determined pursuant to Kule 38 (c).