Daniel BRADLEY, et al., Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Nos. 617–85 C, 394–86, 477–86, 90–101, 90–629 and 91–1645.

United States Claims Court.

June 26, 1992.

Lawrence J. Sherman, Washington, D.C., for plaintiffs.

Hillary A. Stern, with whom were Asst. Atty. Gen. Stuart M. Gerson, David M. Cohen and Stephen J. McHale, Washington, D.C., for defendant. Suzanne Wilson and Kathleen J. Taylor, Dept. of the Treasury, of counsel.

## OPINION and ORDER

TURNER, Judge.

Plaintiffs in these six consolidated cases are journeymen plate printers (and their local union) currently or formerly employed by the Bureau of Engraving and Printing ("BEP"), an agency within the Department of the Treasury.[1] They challenge a pay determination made by the appropriate Treasury official on July 28, 1989, which rejected a requested increase in their wage rates. Plaintiffs contend that the determination constituted an unlawful, arbitrary and capricious exercise of the pay-fixing authority established by 5 U.S.C. § 5349(a). Plaintiffs seek increased rates of pay and back pay retroactive to April 1, 1983.

The first of these consolidated cases was filed in 1985. For the history of this litigation preceding the pivotal July 28, 1989 pay decision which is the focus of this opinion, reference is made to *Bradley v. United States*, 14 Cl.Ct. 741 (1988) (finding plaintiffs' complaint premature in absence of

---

1. There are 193 individual plaintiffs in these six actions (six in No. 617–85, 145 in No. 394–86, one in No. 477–86, 23 in No. 90–101, 16 in No. 90–629, and two in No. 91–1645). In addition, the Washington Plate Printers Union, Local # 2, the local union representing the individual plaintiffs, is also listed as a plaintiff in Nos. 617–85, 90–629, and 91–1645. *See* transcript of status conference held February 25, 1986, pp. 14–15. The appropriateness of the local union's status as a party has not been adjudicated.

agency pay-fixing decision) and *Bradley v. United States*, 870 F.2d 1578 (Fed.Cir.1989) (vacating and remanding with direction to compel prompt wage-rate determination by pay-fixing authority). Familiarity with these two opinions is presumed.

An evidentiary hearing was conducted in Washington, D.C. on November 13 and 14, 1990, and closing arguments took place on December 12, 1990.

For reasons set forth below, we conclude that the agency decision declining to adjust plaintiffs' wage rates by realignment with higher private-sector rates was within the broad discretion of the decision-maker and was not otherwise unlawful, arbitrary or capricious. Consequently, defendant is entitled to judgment in each of these actions.

## I

Wages paid to BEP plate printers are governed by 5 U.S.C. § 5349(a) which provides: "The pay of [BEP plate printers] ... shall be fixed and adjusted from time to time as nearly as is consistent with the public interest in accordance with prevailing rates ... as the pay-fixing authority [for BEP] may determine." The parties concur that the "pay-fixing authority" for wages of BEP plate printers is the Assistant Secretary of the Treasury (Management). For ease of reference, said pay-fixing official shall be referred to as "ASTM."

The personnel manual of the Treasury Department states that employees performing or supervising the work of various crafts at BEP, including plate printing, will be paid a wage based upon a job-to-job comparison with comparable jobs at the American Bank Note Company (ABN), New York, New York. *See* Treasury Personnel Manual, ch. 532, subch. 2, ¶ 2–2d (1969) (superseded Jan. 23, 1984); Treasury Personnel Management Manual, ch. 532, subch. IV, ¶ 3b (1984). For purposes of these cases, consistent with the assumption of the parties, we assume without deciding that the relevant provisions of the Treasury Department personnel manual have the force and effect of agency regulations implementing 5 U.S.C. § 5349(a). *See*

*United States v. Fausto*, 484 U.S. 439, 442 n. 2, 108 S.Ct. 668, 670 n. 2, 98 L.Ed.2d 830 (1988). Hereafter we refer to provisions of the Treasury personnel manual as regulations.

Section 5349(a) is part of the statutory mechanism for setting the wages of skilled craftsmen employed in federal agencies by comparison with prevailing private-sector wages for similar crafts in various "local wage areas." *See* 5 U.S.C. §§ 5102(c)(7), 5341–49. (This method is in contrast with the General Schedule, 5 U.S.C. §§ 5331–38, the Senior Executive Service, 5 U.S.C. §§ 5381–85, and the Executive Schedule, 5 U.S.C. §§ 5311–18, which contemplate the same salary for a particular grade throughout the nation.) Pursuant to the cited Treasury regulations, plaintiffs' wages are compared with those of plate printers performing similar duties at ABN. BEP's primary business is the printing of currency and postage stamps for the U.S. government. ABN is a private company in the business of printing various security documents including stock certificates, bond certificates, foreign currency, travelers checks, birth certificates and drivers licenses.

## II

Since 1970, the wages of BEP plate printers have been aligned with those of ABN plate printers operating the TA–2 single-color press. At the time this linkage was established, the TA–2 rate was the highest paid at ABN. In 1984, plaintiffs requested that ASTM increase their pay-rate by realigning their wages with ABN printers that operate a press more technically advanced than the TA–2 single color press, namely the WRIP two-color press. Plaintiffs' request was eventually denied by a decision of ASTM dated July 28, 1989 (PX 110). In this "Pay Determination for BEP Plate Printers," the wage-setting official considered, *inter alia*, (1) comparisons between BEP and ABN machinery, (2) staffing differences between BEP and ABN and (3) supervisory-control differences between BEP and ABN. *Id.* ASTM also considered multiple public interest factors, including

(1) BEP's ability to attract and retain qualified employees, (2) increased production costs, (3) increased government spending and (4) the fact that plate printers' salaries were beginning to exceed the salaries of some BEP executives, including the annual salary of the Treasurer of the United States. *Id.* at 6–7.

### III

These cases seek judicial review of final agency action adversely affecting plaintiffs. Consequently, both the scope and standard of review are those applicable to review of administrative decisions.

#### A. *Nature of Agency Action*

In the context of administrative law, setting wage rates pursuant to prevailing-wage statutes, including 5 U.S.C. § 5349(a), constitutes informal[2] rulemaking. 5 U.S.C. § 551(4) & (5) (defining "rule" as "an agency statement of . . . particular applicability and future effect designed to implement . . . law . . . and includes the approval or prescription for the future of . . . wages" and defining "rule making" as "agency process for formulating, amending, or repealing a rule").

#### B. *Scope of Review*

Ordinarily, a court's review of an agency decision is limited to the administrative record developed by the agency. *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973) ("the focal point for judicial review should be the administrative record already in existence, not some new record made initially by the reviewing court").[3] However, there are circumstances under which it is appropriate for a trial court to supplement an administrative record. In *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C.Cir.1989), the court found that "exceptions to the general rule have been recognized" under the following circumstances:

(1) when agency action is not adequately explained in the record before the court; (2) when the agency failed to consider factors which are relevant to its final decision; (3) when an agency considered evidence which it failed to include in the record; (4) *when a case is so complex that a court needs more evidence to enable it to understand the issues clearly;* (5) in cases where evidence arising after the agency action shows whether the decision was correct or not; (6) in cases where agencies are sued for a failure to take action; (7) in cases arising under the National Environmental Policy Act; and (8) in cases where relief is at issue, especially at the preliminary injunction stage.

(Emphasis added.) The Court of Appeals for the District of Columbia also permitted supplementation of the administrative record by the trial court in *Natural Resources Defense Council, Inc. v. Train*, 519 F.2d 287 (D.C.Cir.1975) (litigants challenging an agency decision presented affidavit making a substantial showing that the agency had not filed the entire administrative record with the court).

An exception to the general rule was present in these cases, i.e., the factual context for ASTM's decision was sufficiently complex and technical that meaningful review required evidence explicating such context. A supplementary evidentiary hearing was conducted to provide an understanding of the complex nature of plate printing technology generally and the specific technology employed at BEP and ABN in particular and to provide a clear and detailed understanding of the particular presses used at BEP and ABN. The hearing was necessary to enable the court to determine whether ASTM's decision of July 28, 1989 was arbitrary and capricious or an abuse of discretion. Although not essen-

---

**2.** Formal requirements of public notice and opportunity for public participation generally applicable to agency rulemaking do not apply with respect to "a matter relating to agency management or personnel." 5 U.S.C. § 553(a)(2).

**3.** Restriction to the administrative record is a correlative of the standard of judicial review

generally applicable to appeals from administrative agency action. The usual standard of review (absent statutory or decisional modification) is whether the agency action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). See Part III C in text.

tial to the review, the parties presented evidence of traditional methodology for setting wages which has assisted in evaluating the administrative wage determination. A summary of the evidence received at the hearing is set forth in the Appendix to this opinion.

### C. *Standard of Review*

The standard for review of agency decisions in the pay-fixing context is set forth in both statutory and case law.

At the outset (and in the absence of law requiring a more restrictive review), the standard for review of ASTM's determination is that articulated in the Administrative Procedure Act, 5 U.S.C. § 706. The APA articulates standards for a court to follow when reviewing administrative action, including rulemaking:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>
> . . . .
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> . . . .
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> . . . .
>
> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

Application of these statutory review standards requires a "thorough, probing, in-depth review" of the agency action to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–16, 91 S.Ct. 814, 822–24, 28 L.Ed.2d 136 (1971). A reviewing court is not empowered to substitute its judgment for that of the agency and the agency construction need not be the only reasonable one or the one that the reviewing court would have reached. *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69, 83 S.Ct. 239, 245–46, 9 L.Ed.2d 207 (1962). Rather, " 'the judicial function is exhausted when there is found to be a rational basis for the [administrative] conclusions.' " *Nabisco, Inc. v. United States*, 220 Ct.Cl. 332, 599 F.2d 415, 419 (1979) (quoting *Port Auth. of St. Paul v. United States*, 193 Ct.Cl. 108, 432 F.2d 455, 461 (1970)). An administrator's decision is entitled to substantial deference. *Rogers v. United States*, 14 Cl.Ct. 39, 46 (1987), *aff'd*, 861 F.2d 729 (Fed.Cir.1988), *cert. denied*, 490 U.S. 1034, 109 S.Ct. 1930, 104 L.Ed.2d 403 (1989). Indeed, the court must presume that the administrator acted correctly and with regularity. *Overton Park*, 401 U.S. at 415, 91 S.Ct. at 823.

Thus, in the absence of case law requiring a more restrictive evaluation, agency action is ordinarily reviewed to determine whether it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." In *Melissa Hines v. Secretary of the Dep't of Health & Human Servs.*, 940 F.2d 1518, 1527–28 (Fed. Cir.1991), the Federal Circuit summarized relevant case law applying the "arbitrary and capricious" standard:

> While no uniform definition of this standard has emerged, it has been formulated in a variety of ways which suggest its meaning: "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971) (review of agency rulemaking under the Administrative Procedures Act); "an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the

problem, offered an explanation for its decision that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or product of agency expertise," *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983) (review of agency rulemaking); agency must articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made," *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962) (review of agency adjudication); "proof that there was 'no reasonable basis' for the administrative decision will also suffice [to show arbitrary and capricious conduct], at least in many situations," *Prineville Sawmill Co., Inc. v. United States,* 859 F.2d 905, 913 (Fed.Cir.1988) (quoting *Keco Ind., Inc. v. United States,* 492 F.2d 1200, 1203–04, 203 Ct.Cl. 566 (1974)) (review of pre-award bid protest action against letting of government contract); reviewing court must "guard against an agency's drawing inferences that are 'arbitrary' in relation to the facts found, no matter how substantial may be the support for those facts," *Midtec Paper Corp. v. United States,* 857 F.2d 1487, 1498 (D.C.Cir.1988) (review of agency adjudication); "the central focus of the arbitrary and capricious standard is on the rationality of the agency's 'decisionmaking,' rather than its actual decision," *United States v. Garner,* 767 F.2d 104, 116 (5th Cir.1985); "whether the decision was based on a consideration of relevant factors, whether there has been a clear error of judgment and whether there is a rational basis for the conclusions ...," *Mobil Oil Corp. v. Department of Ener-*

*gy,* 610 F.2d 796, 801 (Temp.Emer.Ct.App.1979), *cert. denied,* 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980) (review of agency rulemaking) (quoting *Texaco, Inc. v. Federal Energy Admin.,* 531 F.2d 1071, 1076–77 (Temp.Emer.Ct.App.1976)).

### D. Restricted Standard for Review of Pay-fixing Decisions

Review of agency pay-fixing under a prevailing-wage statute is even more restricted than would otherwise be the case as a result of the administrator's broad discretion to match the appropriate private-sector wage "as nearly as is consistent with the public interest ... as the pay-fixing authority ... may determine." 5 U.S.C. § 5349(a). Thus, there are two components used in making a wage determination for employees at BEP: prevailing rates and public interest.[4] In making a pay determination, ASTM need not accord equal weight to both factors; he may weigh the public interest factor more heavily than the prevailing rate factor. *See Adams v. United States,* 9 Cl.Ct. 546, 549 (1986), *aff'd,* 810 F.2d 1142 (Fed.Cir.1987). The "public interest exception allows broad administrative flexibility and discretion in implementing pay increases." *Archer v. United States,* 18 Cl.Ct. 603, 607 (1989) (citing *Bradley v. United States,* 870 F.2d 1578, 1581 (Fed.Cir.1989)).

In *National Maritime Union v. United States,* 231 Ct.Cl. 59, 75, 682 F.2d 944, 955 (1982) (addressing wage decision pursuant to 5 U.S.C. § 5348(a) (similar in concept and purpose to § 5349)), the Court of Claims held: "Unless there is a *flagrant* abuse of discretion, this court will not meddle in an administrative wage-setting process the supervision of which is committed by statute

---

**4.** In *National Maritime Union v. United States,* 231 Ct.Cl. 59, 75, 682 F.2d 944, 955 (1982), the Court of Claims stated:

We may draw two conclusions from this structure [of pay-fixing statutes]. First, the primary purpose of the statute is to ensure that the pay of these employees will be comparable to those in the private sector. Second, the public interest is a consideration placed in opposition to equality of pay. The

language "as nearly as is consistent with" anticipates that equality of pay may *not* always be entirely consistent with the public interest. These countervailing considerations create a kind of tension in the statute which is crucial to the system, as it provides the administrative discretion needed to operate efficiently a wage system.

(Emphasis in original.)

to the agency [emphasis added]." The court characterized as "heavy" the burden of a challenger to show that an agency's wage setting decision "was arbitrary or clearly wrong." In *Adams v. United States*, 810 F.2d 1142, 1144 (Fed.Cir.1987), the Federal Circuit followed this authority, adding that a court may overturn such a decision only if there has been an abuse of discretion, or if it is " 'so arbitrary as to be clearly wrong' " (quoting *Baratt v. United States*, 218 Ct.Cl. 242, 585 F.2d 1041, 1045 (1978)). "The fundamental limitation is that the discretion not be exercised so as to frustrate the congressional scheme." *National Maritime*, 682 F.2d at 954. In *Bradley v. United States*, 870 F.2d 1578, 1580 (1989), the Federal Circuit expressed its continuing approval of these precedents.

## IV

■ Based on the foregoing, it is clear that plaintiffs' burden of proof is exceedingly heavy. ASTM's decision is entitled to substantial deference. To obtain relief, plaintiffs must demonstrate a "flagrant" abuse of discretion and show that the decision was not based on a consideration of relevant factors. Although plaintiffs have presented a thorough, comprehensive and compelling case which engenders much sympathy, they have not demonstrated the absence of rationality and administrative judgment which would be required to prevail on the merits.

The fundamental issue for resolution is whether ASTM's decision denying plaintiffs' request for realignment of wages (PX 110) was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. The decision was issued in a memorandum dated July 28, 1989 to the Director of BEP. *Id.*

Concerning the appropriate comparable private-sector wage, ASTM's memorandum stated:

> Given BEP's staffing practices, I do not believe that the full ABN TA–2 press rate continues to be justified for all BEP plate printers, let alone the higher WRIP press rate. [footnote omitted] Based on the foregoing, the Department cannot

conclude that the BEP plate printers' pay should be tied to the WRIP press. It would appear that the presses at BEP are more heavily manned to a significant degree than those at ABN and the BEP plate printers are under greater supervisory controls.

*Id.* at 6. Notwithstanding this suggestion that the appropriate matching wage should actually be less than the TA–2 rate, government counsel stipulated that ASTM's current official position is that ABN's TA–2 single color rate is the prevailing rate for purposes of fixing plaintiffs' wage rate (Tr. 244–45).

The memorandum demonstrates that ASTM focused precisely upon the statute and regulation controlling plate printers' wages. PX 110 at 1. ASTM rested his decision upon both (1) staffing and supervisory practices at BEP compared with those at ABN and (2) public interest factors. He noted that when the then-highest TA–2 rate at ABN was selected in the early 1970's as the matching rate for BEP printers, it was done on the assumption "that BEP would continue to adhere to the ABNC policy of assigning only one journeyman plate printer to a press and requiring that plate printer to be fully responsible for press operations." *Id.* at 2. He further noted that this staffing policy had changed over the years so that during times relevant to this litigation, two or three printers manned each press at BEP. Additionally, ASTM noted that the ratio of foremen to plate printers in BEP operations was significantly higher than at ABN. *Id.* at 5.

The memorandum addressed "public interest" factors as follows:

> Even if there were more closely aligned staffing practices, at this time, I believe that there are strong public interest considerations for not providing any additional wage increase. *Indeed, these considerations, standing alone, would compel my determination that no increase should be given.*

PX 110 at 6 (emphasis added). The specific "public interest" considerations included:

> (1) BEP has consistently been able to attract and retain qualified employees

(plate printers do not leave BEP to work at ABN; on the contrary, many printers leave ABN to work for BEP);

(2) an increase in pay would result in increasing BEP's costs of production for both currency and postage stamps which would be ultimately passed on to BEP's customers, the Federal Reserve and the U.S. Postal Service, and ultimately to the public; and

(3) salary misalignment, i.e., salaries of BEP plate printers and their supervisors is approaching, and in certain instances exceeding, the salaries of BEP's executives, including the Treasurer of the United States.

*Id.* at 6–7.

In formulating his final determination, ASTM concluded that BEP plate printers may require less craft expertise than printers at ABN since the BEP presses are significantly more automated than ABN presses. *Id.* at 3. Although not specifically noted by ASTM, we find highly supportive the fact that, unlike ABN, BEP employs approximately 140 electro-machinists, machinists and electricians (compared with a current total of approximately 140 plate printers) whose function is to repair and maintain production equipment, a traditional part of the plate printer's craft. *See* Appendix at 706.

Based upon the entire administrative record, together with the stipulations, transcripts and exhibits pertaining to the evidentiary hearing conducted in November 1990, we conclude that the denial of plaintiffs' request for realignment of wages was not arbitrary, nor capricious, nor an abuse of the pay-fixer's discretion.

Two things make a precise "job-to-job" wage comparison between BEP and ABN impossible in a literal sense: (1) none of the presses used at BEP is like those which continue to be used at ABN, and (2) wage rates at ABN depend upon the particular press a printer operates, whereas at BEP, consistent with plaintiffs' wishes, all jour-

neymen printers are paid at exactly the same rate, irrespective of the type of press each operates. *See* Appendix. Given this literal impossibility and the rational attempt by ASTM to make the comparison required by the Treasury regulation, plaintiffs' burden to demonstrate arbitrariness or flagrant abuse of discretion is all the more difficult.[5]

Plaintiffs present a plausible argument for wage rate realignment. They assert that since the machinery at BEP is more automated and runs significantly faster than the presses at ABN, BEP printers should be paid more, not less, than the printers that operate the less sophisticated machinery at ABN. However plausible this argument may be, this was not a conclusion that ASTM was required to reach. One can argue with equal plausibility that the more automated the machinery, the less skill its operators are required to possess. ASTM adoption of this rationale cannot be found arbitrary, even if it was not the only possible reasonable conclusion.

As the Appendix to this opinion indicates, the machinery used at BEP and ABN is significantly different. Likewise, the duties and responsibilities of the plate printers that operate these various machines vary tremendously. It is not the role of this court to make a *de novo* review of the facts upon which ASTM relied in making its determination. The evidentiary hearing conducted before this court in November 1990 demonstrated that there was no ultimate conclusion that ASTM was required to reach. In fact, one of the plaintiffs' experts testified that making job comparisons between BEP and ABN plate printers was ultimately a matter of subjectivity. *See* Tr. 227, lines 16–20.

## V

Based on the foregoing, we hold that the July 28, 1989 ASTM decision denying plaintiffs' request for realignment of wage

---

5. In *Abbott v. United States,* 138 Ct.Cl. 459, 463, 151 F.Supp. 929 (1957), the Court of Claims said with respect to a statutory wage fixing scheme similar to that involved in these suits: "If the Government carries on an enterprise which has no exact counterpart in private industry, a wage-fixing authority must necessarily use comparisons and analogies in fixing wages in the unique Government enterprise, if it has the duty of setting a fair and competitive wage."

rates was not arbitrary, capricious, irrational or otherwise defective in a way which would entitle plaintiffs to the relief they seek.

Accordingly, it is ORDERED that judgment for defendant shall be entered in each of these consolidated cases. Each party shall bear its own costs.

### APPENDIX

This appendix contains (1) a general overview of the functions and processes involved in plate press operations, (2) a description of the presses used by the American Bank Note Company and by the Bureau of Engraving and Printing, (3) an explanation of staffing practices at both ABN and BEP, and, (4) a description of the current wage practices at ABN and BEP.

A. *Overview of Plate Press Technology*

In the most general sense, plate printing can be broken down into three processes:

(1) sheets or rolls of paper are first fed into the press;

(2) the paper is then plate printed; and

(3) finally, the printed paper is fed out and delivered from the press.

Processes (1) and (3) involve the entry and exiting of paper from the press. Although the feeding of paper into the press may have many variations, for purposes of these cases, the feed-in system of a press is either (i) sheet-fed or (ii) web-fed. This distinction can be illustrated by analogy:

(i) sheet-fed—paper is stacked with each sheet one on top of the other—similar to the way paper is stacked before it is fed into a photocopying machine;

(ii) web-fed—each sheet of paper is perforated and attached to the next sheet; the entire web of paper is guided into the press by spindle wheels located at each side of the paper web—similar to the way computer paper is fed into a dot-matrix printer.

The second of the three processes, i.e., the actual printing of the paper, is the most complex of the three processes. The plate printing process (when the paper is actually printed) combines three different sub-processes:

(a) inking system—first, the plates are inked;

(b) wiping system—after the plates are inked, the plates are wiped to remove unwanted excess ink (the only ink that should remain on the plates is the ink inside the grooves of the plate);

(c) impression system—finally, once the plates are prepared, the paper is pressed (using up to 50,000 lbs. of pressure) onto the plates such that the ink within the plate grooves is transferred to the paper.

B. *Description of Relevant Plate Presses*

None of the press equipment used at ABN is identical to the press equipment currently used at BEP. In the following explanation of the overall function of relevant plate presses, five functional components are utilized:

1. the in-feed system—paper is fed into the press;

2. the inking system—ink is applied to the plates;

3. the wiping system—excess ink is wiped from the plates;

4. the impression system—ink is transferred from the plate grooves to the paper; and

5. the delivery system—the printed paper is fed out of the press.

(PX 112).[1]

*ABN Plate Presses*

The following is a list (along with the quantity) of the press equipment used at ABN during the time period relevant to this lawsuit:

---

**1.** The following abbreviations for document references are used in text:

a. "PX __" refers to plaintiffs' Exhibit No. __.

b. "Tr. __" refers to transcript pages pertaining to the evidentiary hearing conducted on November 13 and 14, 1990.

c. "Amend.Jt.Stip., p. __" refers to pages of the Amended Joint Stipulation filed December 7, 1990.

d. "Def.App. __" refers to pages of the appendix to defendant's motion for summary judgment filed December 13, 1989.

—TA–1 (5)

—TA–2 (14)

—WRIP (3)

—Mod 2 Simplex (1)

—various hand presses

The mainstay of press equipment at ABN during the relevant time period was the "TA" press (Tr. 78). In this appendix, the term "TA" press will refer to both the "TA–1" and the "TA–2" presses. Of the approximately twenty-three total presses at ABN, fourteen were TA–2 presses, five were TA–1 presses and three were "WRIP" presses (Web Rotary Intaglio Printing presses). ABN also has a press called the "Mod 2 Simplex" and in addition used various "hand" presses (PX 109 at 4 n. 6).

*—The "TA" Press*

The TA press (PX 113d) is approximately 20 feet long, 10 feet wide and 8 feet high. It is a sheet-fed, intaglio [2] press that runs at a speed of 2,000 sheets per hour (Amend.Jt.Stip., p. 4). The press shuts down when the plate printer loads blank paper into the feeder. The feeder system carries individual sheets of paper through a two-plate printing process.

The impression system on the TA–2 press consists of a common impression cylinder and two plates. Ink is applied to one cylinder from one of two ink fountains. This cylinder rotates past the impression cylinder upon which two metal plates of engraved intaglio imagery have been installed.

Excess ink is removed from the engraved plates by a scraper blade and a paper-wipe system before each sheet of paper is imprinted (Amend.Jt.Stip., p. 4). The press has a two-color capacity and ink is applied in ribbons from ink fountains which are controlled by fountain keys. There are two fountain keys per fountain for a maximum of four fountain keys on the TA press. There is no system to control the temperature of the plates. The type of ink used

functions at a range of different temperatures.

The wiping system on the TA press consists of a scraper blade which removes 75 percent of the excess ink and two rolls of rag paper (paper wipes) which remove 25 percent of the ink. The plate printer is responsible for loading paper into the feeder, adjusting the scraper blade so that it doesn't scratch the plate, changing the rolls of paper on the paper wipe, adjusting the ink flow with the fountain keys, adjusting the engraved plates and maintaining the registration on the printed product (Tr. 60–62). The plate printer also manually recovers excess ink and returns it to the ink fountain (Amend.Jt.Stip., p. 5).

The TA press does not have a drying unit and the delivery system consists of a roll of paraffin paper onto which printed sheets are rolled. A paper handler maintains the delivery system and changes the paraffin paper roll when necessary (Tr. 62). Otherwise, the press is operated by one plate printer.

*—The WRIP Press*

The WRIP press (PX 113e, 113f) is a modified version of the TA press. It measures approximately 20 feet long, 16 feet high and 12 feet wide (Amend.Jt.Stip., p. 6). It is very similar to the TA press except for the in-feed system which has been converted from a sheet-fed to a web-fed system.

On a web press, the paper is supplied in one continuous roll as opposed to individual sheets (Tr. 63). Although most web-fed presses run continuously and faster than sheet-fed presses, the WRIP press is an exception (Tr. 88–89). It runs in a stop-and-go fashion at a speed of 2200 "sheets" per hour. The WRIP press cannot run continuously because of its impression cylinder which was designed for a sheet-fed press (Tr. 64). With the exception of the in-feed system, the TA press and the WRIP press are identical.

The impression system, the inking system, the wiping system and the delivery

---

**2.** Intaglio printing involves a process whereby an engraved plate is placed under great pressure to produce a printed product in fine detail. The process is used to print security documents because of the difficulty involved in duplicating the printed product.

system on the WRIP press are the same as those on the TA press. Like the TA press, the WRIP press is operated by one plate printer and one paper handler.

Because of the web in-feed system, the plate printer operating the WRIP press has increased duties and must exercise greater skill than the TA press operator (Tr. 65). For example, the WRIP press operator must continually monitor and adjust the web tension mechanism using a pin-wheel gear assembly located on each side of a spool on which the web is mounted. In order to insure that the stop-and-go motion of the press does not tear the web, the plate printer must drape the web of paper so that there is slack before and after the print is made. The slackness protects the web from breaks and allows for air drying before the printed product reaches the paraffin roll (Amend.Jt.Stip., p. 6).

In addition, there are unique "registration" problems associated with the WRIP press. (The term "registration" refers to alignment of the printed intaglio image on the finished product.) For example, when the paper stock used has been preprinted with offset printing, the intaglio images must be aligned with the preprinted offset printing in order to achieve the desired result. In addition, printing jobs may require the use of computer format paper which contains perforations separating each piece. Not only must the intaglio printing be aligned with any preprinted offset printing, but it also must be aligned with the perforations separating each sheet.

On the WRIP press, the plate printer maintains registration by controlling the tension of the paper as it moves through the press. This is accomplished by adjusting the pin wheel assembly and by monitoring the loops of paper as they feed into the press (Tr. 66–68). On the TA–2 press, registration of the printed product is maintained with front guides and a side guide on the feeder. Paper tension is not a factor in maintaining registration on the TA–2 press since it is sheet fed (Tr. 69).

The trial record (as opposed to the administrative record) contains references to a "multi-color simplex press" operated at ABN. The evidence indicated that the multi-color simplex press is ABN's most complex press, that two plate printers are assigned to operate it and that such operators are paid at a rate higher than the WRIP press rate (Def.App. 83–84). No further information concerning the multi-color simplex press was presented at the trial. Consequently, the comparison of wage rates omits any comparison with the simplex press wage rate.

*BEP Plate Presses*

Plate printers at BEP operate both currency and postage stamp presses. Presently, there are nineteen presses operating on a regular basis at BEP, fourteen of which are currency presses and five of which are stamp presses (Tr. 278).

The mainstay of currency press equipment at BEP is the I–8 press. Currently at BEP, the following presses are used to print currency (the quantities are included in parenthesis):

—I–8 (12);

—98 (2).

(Tr. 278, PX 109). During the time period covered by this litigation, BEP also operated other currency presses which are now obsolete. These included:

—the 74 press;

—the 80 press; and

—the magna press.

(Tr. 55–56; Amend.Jt.Stip., pp. 10, 11).

The postage stamp printing operation consists of several high-speed, multi-craft presses all of which are more complex than any press at ABN (Tr. 200). The stamp presses include:

—the A press;

—the B press;

—the C press;

—the D press; and

—a seven-color gravure press.

*BEP Currency Presses*

Following is a description of the various currency presses used at BEP during periods relevant to this litigation.

—*The "74" Press*

The 74 press was used to print currency at BEP. It measured approximately 34 feet long by 9.5 feet wide by 10 feet high and was arranged in two levels (Amend. Jt.Stip., p. 9; PX 113j). It was a sheet-fed, intaglio press capable of printing 7000 sheets per hour using a continuous feeder system (Tr. 83). The 74 press has not been in operation at BEP since 1987.

The impression system on the 74 press consisted of a four plate cylinder and a four segment impression cylinder. It had a one-color printing capacity and seven to nine fountain keys on the ink fountain (Tr. 85).

The 74 press' wiping system consisted of three rolls of paper which removed 100% of the ink from the surface of the engraved plate before it was printed. Only the ink remaining in the engraved lines on the plate was used to produce the image. There was no scraper blade (Amend. Jt.Stip., pp. 9–10).

The 74 press had a high-speed delivery system consisting of a stacking unit and a jogger box [3] which was maintained by the plate printer (Tr. 84).

—*The "80" Press*

Like the 74 press, the 80 press is no longer used at BEP. It measured 34 feet long by 9.5 feet wide by 10 feet high and was arranged in two levels (Amend.Jt.Stip., p. 11). It was a sheet-fed, intaglio press that ran continuously at a speed of 8000 sheets per hour. The 80 press was an updated and faster version of the 74 press. It had a water-controlled heating device called a churchill unit which controlled the temperature of the plate cylinder. Otherwise, the 80 press was very similar to the 74 press (Tr. 106).

—*The "98" Press*

The 98 press was an improvement over the 80 press at BEP. Two 98 presses are presently used to print currency. The 98 press measures 39 feet long by 12.5 feet wide by 9.5 feet high and is arranged in two levels (Amend.Jt.Stip., p. 11). It is a continuous sheet-fed, intaglio press that prints at a speed of 8500 sheets per hour. The impression and inking systems on the 98 press are very similar to the 74 press and the 80 press. The biggest difference between the 98 press and the 74 and 80 presses is the wiping system (Amend. Jt.Stip., pp. 11–12).

Similar to the 74 and 80 presses, the 98 press also uses three paper wipes. However, on the 98 press, the paper wipe system runs continuously. On the earlier presses, changing rolls of paper on the paper wipe necessitated stopping the press. On the 98 press, the plate printer must splice on new rolls of paper while the paper wipe is operating (Amend.Jt.Stip., p. 12).

—*The "I–8" Press*

The I–8 press is the next most sophisticated press at BEP after the 98 press. It is 37.5 feet long by 11.5 feet wide by 12 feet high and is arranged in two levels. It is a continuous sheet-fed intaglio press capable of printing 8000 sheets per hour. There are 12 I–8 presses currently printing currency at BEP. During the relevant time period, BEP also printed commemorative postage stamps on the I–8 press when production demands required (Amend. Jt.Stip., pp. 12–13).

The impression system on the I–8 press is similar to the 98, 80 and 74 presses in that it uses four plates and a four segment impression cylinder. The most significant differences regarding the I–8 press concern the inking and wiping systems. The I–8 press uses a selective inking system which allows it to print in three colors. In addition, the I–8 press has a chemical wipe system as opposed to a paper wipe. Selective inking cannot be done on a press using a paper wipe system (Tr. 110).

---

**3.** A jogger box is a device which vibrates back and forth at high speed (jogs) in order to stack neatly sheets of printed product as they come off the press.

The selective inking system allows a plate printer to apply ink in any of three-colors anywhere on the engraved plate. There are three ink fountains on the press not all of which have to be used on every job. Each fountain has 25 fountain keys which control the distribution of the ink on the engraved plate (Tr. 122–123). There is a maximum of 75 fountain keys on the I–8 press which are individually controlled by the plate printer. Apart from the press itself, a manual pantograph operation is used to cut out the rubber on the ink rollers, leaving only the amount of surface that the plate printer wants to ink on the plate (Tr. 116, 270). If special cuts are necessary, they are done by plate printer foremen on a laser pantograph (Tr. 271).

The I–8 press also has a temperature control device called a Dalmar unit. It is used to heat water that runs through the plate cylinder. The temperature of the plate cylinder is important to obtain a quality image because the ink used on the press only performs at a certain temperature (Tr. 126, 271–72). Increasing the temperature also helps obtain a cleaner wipe of the engraved plate. The plate printer sets the appropriate temperatures on the Dalmar unit and then monitors it with a control gauge (Tr. 272). A computer on the press regulates a sophisticated electronic system used to alert the plate printers to problems as well as to assure proper registration of the product (Amend.Jt.Stip., p. 13).

Another feature of selective inking is its use in anti-counterfeiting deterrence programs. Selective inking can be done in different colors as well as in magnetic and non-magnetic ink. When BEP prints currency with the I–8 press using selective inking, there are two black inks, one magnetic and the other non-magnetic. Certain parts of the black inking on currency are printed with magnetic ink and other portions are printed with non-magnetic ink as a security device. The currency can then be electronically scanned to determine whether it is genuine (Tr. 118–19). Even though both inks are black, alignment must still be maintained because each bill must be inked consistently (Tr. 120).

Another major distinguishing feature about the I–8 press is the chemical wipe system. Instead of paper wipes, there is a rubber cylinder which wipes the plates with a caustic soda solution. Plate printers adjust the flow meters controlling the amount of caustic cleaning solution dispensed through both manual and electronic means (Amend.Jt.Stip., p. 13). In addition, the chemical wiping system has three cleaning brushes, five sprays and three scraper blades that the plate printer maintains and adjusts (Amend.Jt.Stip., pp. 12–13). The I–8 press also has a pre-wipe blade which removes excess ink before the chemical wipe roller so the plate printer can recycle it for subsequent use (Amend.Jt.Stip., p. 13).

### BEP Postage Stamp Presses

The postage stamp presses at BEP are high-speed, multi-craft, web-fed presses which run at speeds between 12,000 and 15,000 sheets per hour. The various postage stamp presses used at BEP are the following:

#### —The "A" Press

The A press (PX 113w) combines three different printing classifications: five-color gravure, three-color intaglio and one-color letterpress. It can perform each of these types of printing either individually or simultaneously. The A press measures 111 feet long by 12 feet wide (with an additional twelve feet for consoles, ducting, hydraulic and ink pumps) by 14.5 feet high.

Paper is fed into the press by means of a web which runs the paper through five gravure printing units before reaching the intaglio units. The gravure units operate through the rotation of separate cylinders onto which a single-color is applied from an ink bath or sump. As each cylinder passes through the inking system, the excess ink is removed by a blade (referred to as a doctor blade) before the image is printed on the web.

After passing through the cylinder at each gravure station, the product is dried by a hot air oven (Amend.Jt.Stip., p. 17).

In addition, the printed product passes through an ultra-violet drying system if phosphor has been applied at the letter press station. Phosphor is applied to United States postage stamps so that mail can be automatically sorted at the post office (Tr. 132). The A press uses a highly sophisticated and unique control console (PX 113x) together with a video monitor and manual adjustments to maintain precise registration of the printed product. The press is capable of unloading the finished product in rolls or in stacks through the use of a perforator, cutter and sheeting system built into the press (Amend.Jt.Stip., pp. 17–18).

*—The "B" Press*

The B press is similar to the A press except that it does not have the five-color gravure printing stations. The B press uses three-color intaglio printing and single-color letter press printing to produce multi-color postage stamps. It measures 52 feet long by 12 feet wide (with an additional 8.10 feet for consoles, ducting, hydraulics and ink pumps) by 15.5 feet high.

Like the A press, the B press is a high-speed, web press which operates continuously through the use of flying paster systems at both the unwind and rewind ends of the press. Adjustments are made both manually and through an electronic control system at each phase of the intaglio printing process. After the product is printed, it is dried by a series of heat lamps in a 30 foot oven which is part of the press (Amend.Jt.Stip., pp. 14–15). In addition to visual examination, a strobe light is used to freeze printed images for high speed visual examination of the product for registration and quality.

*—The "C" Press*

The C press is a multi-color, intaglio, web press like the B press, but it has larger motors and several mechanical enhancements. The press is equipped with an electronically controlled heating system in addition to an insetter that controls registration and accuracy by varying the speed of the paper going through the print stations. The press is capable of producing items with different sheet lengths (Amend. Jt.Stip., p. 16).

*—The "D" Press*

The D press is the most complex press at BEP (Tr. 311). It is a high-speed, continuous web-fed press measuring 98 feet long by 20 feet wide by 13.5 feet high (with an additional width of 8 to 10 feet for consoles and hydraulics) (Amend.Jt.Stip., p. 20). It has the capacity to print simultaneously up to six colors of offset printing (PX 113v) in combination with three colors of intaglio work and one color of letterpress work. It is used to print commemorative stamps in up to ten colors.

The D press uses webbed rolls of paper spliced together for continuous operation. The webbed paper is conditioned by moisture units before entering the offset and intaglio systems in order to control expansion and contracting of the paper in the drying ovens. As the web feeds through the press, up to six offset colors are applied one at a time at separate printing stations. The web then passes through a hot air dryer where it is reconditioned and reregistered. Next, it passes through an intaglio unit where up to three inks are applied and then through another drying system and into a one-color letter press. Afterward, the printed product is inspected at a high-speed scanning station and rewound into rolls (Amend.Jt.Stip., pp. 20–21).

*—The "Seven–Color Gravure" Press*

The fifth postage stamp press at BEP is the seven-color gravure press. This is a web press capable of printing gravure work in up to seven colors. It is used to print commemorative stamps and aerograms and measures 106 feet long (including a 22 foot sheeter addition) by 13.5 feet wide by 10.5 feet high.

Like the gravure portion of the A press, ink is applied to the web at seven separate gravure stations which print at approximately double the speed of the A press. Color, tension, temperature, register and quality must be monitored at each of the seven separate printing units. Special drying systems enable the press to print on both sides of the web as part of the same

printing process. After the product is printed, it is visually inspected with a strobe light and video monitor system. The web is then rewound at the delivery station or perforated, cut and sheeted as required for stamp coils, sheets or books (Amend.Jt.Stip., p. 19). On the seven-color gravure press, plate printers routinely perform all duties associated with the gravure portion of the A press but at double the speed. These duties include overseeing and maintaining the infeed, inking, heating, temperature and delivery systems at each unit in addition to maintaining the overall registration and print quality through the video and strobe systems.

### C. *Staffing and Other Factors*
#### ABN

The July 28, 1989 pay determination by ASTM states that ABN employs a total of 38 plate printers (PX 110 at 6). Both the TA press and the WRIP press at ABN are staffed with one journey level plate printer and one paper-handler (Tr. 51, 61). On both presses, the paper-handler maintains the delivery system which involves changing the roll of paraffin paper onto which the printed product is automatically wound. The plate printer routinely makes adjustments to the impression and plate mechanisms, wiping and polishing devices, ink fountains, the feeder system and all other peripheral attachments on the press. The plate printer is fully responsible for the safe operation of the press equipment. In instances of press malfunction, the printer must diagnose and repair the problem in order to restore the press to operation. Each printer keeps his own tools at the work station for this purpose (Amend. Jt.Stip., pp. 3–4). Each printer is responsible for meeting defined production standards as well as safeguarding against the loss of stock. Since ABN plate printers work alone, each is individually responsible for the completion of each job assigned.

Employment at ABN is less stable and more often subject to lay-offs than employment at BEP (Tr. 42–43; PX 109 at 3 n. 3). ABN is a private company that is subject to various economic cycles. BEP plate printers are federal government employees, and there is a constantly increasing demand for the products they produce, currency and postage stamps (Tr. 306).

#### BEP

BEP employs about 140 plate printers [4] of which approximately thirty operate the stamp presses on a regular basis (Tr. 330). The same plate printers generally always operate the stamp presses. All of the presses at BEP are staffed by at least two journey level plate printers who function as a team. The BEP presses are designed to be operated by two or more plate printers so that they cannot be operated effectively by a single plate printer (Tr. 82–83). Generally, two journey-level plate printers are (or were) assigned to operate the 74 press, the 80 press, the 98 press, the I-8 press, the B press, and the C press. Three journey-level plate printers generally are assigned to operate the A press, the D press and the seven-color gravure press (Amend. Jt.Stip.). In addition, there is an organization at BEP called Production Support which consists of approximately 140 electro-machinists, machinists, and electricians whose function is to repair and maintain production equipment (Tr. 305). There is no counterpart to this group at ABN.

### D. *Current Pay Practices*
#### ABN

The wage of plate printers at ABN is based on the type of press they operate and the single or multi-color requirements of a job. Although it may happen, normally ABN printers do not rotate back and forth among presses (Def.App. 84; Tr. 80). There are several different rates of pay at ABN, the lowest rate corresponding to the hand press. The next highest rate of pay

---

**4.** There is disagreement in the record as to the precise number of plate printers employed by BEP. The Associate Director and Chief Operating Officer of BEP, Mr. Carl D'Allessandro, testified that there are 139 plate printers. The July 28, 1989 pay determination states that there are 162 plate printers (PX 110 at 6). The July 21, 1989 memorandum in support of the Treasury Department's pay determination states that BEP employed approximately 128 plate printers in July 1989 (PX 109 at 3).

is for the TA–1 press followed by the TA–2 single-color press. The next highest is for the TA–2 two-color press, which is the same as the WRIP press single-color rate, followed by the rate for the WRIP press two-color (Tr. 81). The record indicates that the multi-color simplex press at ABN is paid at a higher rate than the WRIP two-color press, however, no evidence of the simplex rate was introduced at the evidentiary hearing. Since there were only three WRIP presses operating at ABN during the time relevant to this litigation, the majority of ABN plate printers earned the TA press rate.

### BEP

Prior to 1970, BEP plate printers were also paid according to which press they operated. This practice was abolished in the early 1970's when the current tandem pay relationship was established and all the BEP plate printers began receiving the same rate of pay regardless of the equipment operated (PX 101). In 1972, the Treasury Department determined that for pay-fixing purposes, BEP's presses were most comparable to ABN's TA–2 press (PX 109 at 2). Since that time, the wage rate for all BEP plate printers has remained aligned with the wage rate paid to ABN plate printers operating the TA–2 single-color press. At the time this alignment was established, the TA–2 press rate was the highest rate paid at ABN. None of the presses used to form the basis for this comparison in 1972 are still in use at BEP today.